2012 UT 35

**In the Matter of the ADOPTION OF BABY B., a minor child.**

**Robert Manzanares, Appellant,**

v.

**Brandon S. Byington and Julissa N. Byington, Appellees,**

**Carie Terry, Intervenor.**

No. 20090740.

Supreme Court of Utah.

June 15, 2012.

Jennifer D. Reyes, Dale M. Dorius, Brigham City, for appellant.

Larry S. Jenkins, Lance D. Rich, Brinton M. Wilkins, Salt Lake City, for appellees.

David J. Hardy, Salt Lake City, for intervenor.

## AMENDED OPINION *

Justice LEE, opinion of the Court:

¶ 1 Robert Manzanares challenges the district court's order terminating his parental rights in his biological daughter, "Baby B." The district court held that Manzanares's consent to the adoption of Baby B. was not required under Utah law. It based this conclusion on a finding that Manzanares either knew or through "reasonable diligence" could have known of at least one of several "qualifying circumstances" defined by Utah law.

¶ 2 We find the district court's conclusions to run counter to a proper understanding of the statute and to be unsupported by the evidence. We accordingly reverse, after clarifying the standards that govern under the Adoption Act and under our prior cases.

## I

¶ 3 In the summer of 2007, Robert Manzanares and Carie Terry conceived a child in Colorado. Manzanares communicated regularly with Terry regarding the pregnancy, and he provided some financial support both before and after the birth of the child. The anticipated date of the child's birth was late March 2008.

¶ 4 Terry ended her relationship with Manzanares in August 2007. Despite the split, Manzanares attempted to maintain contact with Terry by e-mail. Manzanares repeatedly told Terry that he wanted to raise the child and would do so alone if necessary. Terry, in contrast, consistently expressed her desire to place the child for adoption.

¶ 5 In November 2007, Terry asked a Colorado adoption agency to contact Manzanares, requesting that he sign papers consenting to the adoption. Manzanares refused, indicating that he would actively oppose any proposed adoption.

¶ 6 On January 11, 2008, Terry informed Manzanares by e-mail that she was going to Utah for a short visit with her sick father, but that she would return to continue discussions regarding adoption. Terry's e-mail message was as follows:

> I will be flying to Utah to visit my father in Feb[ruary] for a week (maybe a little longer, it depends on how he/things are). Then it will be back to work to finish up the club's construction before I take time off at the end of March.... [I]n April I will be willing to sit down and talk with you about your reconsideration to consent for adoption[;] otherwise this will be a long process and it will benefit no one, especially this baby.

The district court found Terry's e-mail to be "misleading and that the e-mail in general was intended to create the false impression that she would stave off any decisions about adoption until she returned to Colorado." In reality, the court found, she intended to visit Utah to make preparations for a return in late March to deliver the child in Utah.

¶ 7 Five days later, on January 16, 2008, Manzanares filed a paternity action in Colorado, seeking to enjoin any adoption proceeding. Manzanares's petition detailed his perception that Terry wished to place the child for adoption in Utah. Manzanares stated that he was filing the petition

> prior to the child's birth because he has serious and founded concerns that, although the unborn child will not be legally available for adoption pursuant to [Colorado law], [Terry] plans to surreptitiously make the child available for adoption immediately upon his or her birth. [Terry] has repeatedly asserted her intention to give the child up for adoption via telephone and e-mail, and continues to pressure [Manzanares] to authorize an adoption, referring to him as a "chromosome donor."

Based on his "serious and founded concerns," Manzanares asserted that Terry "will flee to Utah, where she has family, to proceed with an adoption." He also alleged a need to "establish immediate jurisdiction in Colorado,

---

* The court has rewritten paragraphs 42–43.

where the parties live and where the child was conceived, prior to the child's birth."

¶ 8 Terry filed a verified response on February 12, 2008. She acknowledged that Manzanares was the biological father of the unborn child and that she was a resident of Colorado, but denied Manzanares's allegations that she intended to surreptitiously give the child up for adoption in Utah, asserting that such allegations call for a "legal conclusion." Instead, Terry asked the Colorado court to "deny [Manzanares] parental rights and responsibilities once [the] baby is born, for the best interest of the baby," and to "allow adoption proceedings" in Colorado "upon [the] baby's birth for the best interest of the baby."

¶ 9 Also on February 12, Terry filed a motion to continue a hearing set for February 20, 2008, asking that the hearing be postponed until late March 2008. In this motion, Terry indicated that she had informed Manzanares and his counsel of her upcoming visit to Utah. Terry's motion to continue was denied.

¶ 10 On February 14, 2008, Terry traveled to Utah for the stated purpose of visiting her sick father. The purported purpose of the trip soon took a turn in a different direction. On February 16, 2008, Terry's brother and sister-in-law, Brandon and Julissa Byington, signed a petition for the adoption of Terry's baby in Utah. Terry also began exploring hospital and midwife options, presumably in preparation for the birth of the baby in Utah. Manzanares apparently had no knowledge of any of these developments at this time.

¶ 11 In the meantime, unpersuaded by Terry's denial of her intent to put the baby up for adoption in Utah, Manzanares filed a response in the Colorado action on February 15, 2008, in which he asserted that Terry "is planning to give birth in Utah and place the parties' unborn child up for adoption." Manzanares further alleged that Terry "plans to drive herself and her six-year-old daughter to Utah at some undetermined point in the future, while pregnant," and that there was a "likelihood that she will flee the State of Colorado … to make the parties' unborn child available for adoption." Despite his concerns, Manzanares did not take action at this point to assert his parental rights in Utah.

¶ 12 While in Utah, Terry gave birth to her child (Baby B.) on February 17, 2008, approximately six weeks premature. At a later evidentiary hearing, Terry indicated that it was not her intention in coming to Utah in February to give birth to the child. On February 19, 2008, the Byingtons filed their adoption petition in the Third District Court. A relinquishment hearing was scheduled for the next day before Judge Hilder.

¶ 13 February 20 was also to be the day the Colorado court held its hearing on Manzanares's paternity and injunction action. Terry, who was still in Utah following the birth of Baby B., called the Colorado court and indicated that she would not be at the hearing. She gave as her reason for not attending the hearing that she was out of town visiting an ill relative. Terry did not inform the court or Manzanares that she had given birth to the child. Nor did she divulge that she was appearing at 8:45 a.m. that day before Judge Hilder to give her consent to the adoption of the child by her brother and sister-in-law. In light of Terry's absence, the Colorado court agreed to continue the hearing until March 5, 2008. Believing Terry to still be pregnant, the court appointed a guardian ad litem for the child.

¶ 14 That same morning at 8:45 a.m., just fifteen minutes before the scheduled Colorado hearing, Terry executed a consent to adoption in Utah before Judge Hilder. Terry did not inform Judge Hilder of the Colorado proceeding.

¶ 15 On February 24, 2008, Terry returned to Colorado. The next day, Manzanares became aware that Terry was no longer pregnant. Manzanares immediately began calling Colorado hospitals in an attempt to locate the child, but he could not find her. Manzanares next called the Byingtons, who indicated only that Manzanares would be contacted by counsel. The Byingtons did not inform Manzanares of their adoption petition.

¶ 16 On February 26, 2008, Manzanares filed an emergency motion with the Colorado court. The court held hearings on February 27, 29, and March 3, 2008. Manzanares and

Terry were both present at those hearings. The Colorado judge granted Manzanares's petition for paternity and signed a final order of paternity on March 3, 2008. The judge also ordered that Manzanares's name be listed on Baby B.'s birth certificate, a potentially significant act under Utah law.[1]

¶ 17 On March 4, 2008, Manzanares filed in Utah a motion to dismiss the Byingtons' adoption petition. The district court (Judge Faust) scheduled a two-day bench trial, to begin July 28, 2008. At trial, Terry testified of her multiple efforts to keep Manzanares in the dark regarding her plans to give birth to the baby and give her up for adoption in Utah. Although she asserted that she hatched the plan to give the baby up for adoption to her brother and sister-in-law in Utah as early as October or November of 2007, Terry testified that she could not "recall" whether she had informed Manzanares of her plans. Judge Faust interpreted her testimony to mean that she "admitted [that] she never advised Mr. Manzanares that she intended to place the child for adoption with her brother and sister-in-law, and that she was intending to do it in Utah." He also noted that "neither the Byingtons [n]or Ms. Terry told [Manzanares] specifically what her adoption plans were." Terry also testified that although she made Manzanares aware of her desire to give the baby up for adoption almost from the beginning of the pregnancy, she never told him that she wanted to place the child with a Mormon family. Yet Manzanares apparently inferred a desire on Terry's part to place the baby in such a family, based on the fact that Terry came from a Mormon family.

¶ 18 At the conclusion of the trial, the court determined that Terry, through deliberative effort, had "deceive[d]" Manzanares. Specifically, the court found that Terry's e-mail to Manzanares telling him of her visit to Utah to see her ailing father was deceitful. In reality, according to the court, Terry "was here to finalize hospital and insurance arrangements, and arrange for midwives and/or doctors which she started working on

as early as December 2007." Based on Terry's testimony, the court found "that she clearly had a plan to return to Utah in March of 2008 to give birth and that she intentionally kept this information from … Manzanares in order to preclude him from taking definitive action in Utah."

¶ 19 The district court found particularly troubling Terry's failure to inform the Utah and Colorado courts of each other and of the actions before them. Indeed, the court considered the "threshold issue" of the case to be "whether Judge Hilder's acceptance of … Terry's Consent to Adoption, which occurred on February 20, 2008, should be vacated." But for "Terry's premature delivery and affirmative steps to mislead the Court through acts of omission as well as commission," the district court believed, "Manzanares certainly would have secured his paternity order well in advance of the child's expected delivery date." Finding Terry's deceptions "highly material," the court found "ample grounds for the vacatur of Judge Hilder's approval and acceptance of … Terry's Consent." The court found that it had authority to vacate Judge Hilder's acceptance because the adoption statutes "do[ ] not expressly preclude the Court from setting aside" an acceptance of consent.

¶ 20 The district court's rationale was based in equity: "[I]t would be a gross injustice and miscarriage of justice to allow … Terry's and [the Byingtons'] action to defeat … Manzanares'[s] legitimate claim to his child and to challenge the adoption under these circumstances."

¶ 21 The district court declined to decide whether Manzanares complied with the requirements of Colorado law to preserve the right to notice of a proceeding in connection with the adoption of Baby B. The court noted, however, that "it does not appear that [Manzanares] has taken any such steps in Utah."

¶ 22 Despite vacating Judge Hilder's acceptance of Terry's consent to adoption, the

---

1. "Notice of an adoption proceeding shall be served" on "any person who, prior to the time the mother executes her consent for adoption or relinquishes the child for adoption, is recorded on the birth certificate as the child's father, with the knowledge and consent of the mother." UTAH CODE § 78B-6-110(2)(f).

district court in a later ruling held that the vacatur "did not render the Consent void from its inception." The court reasoned that the term "executed" found in Utah Code sections 78B–6–122(1)(c)(ii)(A) and (B) refers to the birth mother's execution of her consent, not to the district court's acceptance of the consent. Because the court concluded that Manzanares was aware of multiple "qualifying circumstances," it held that "the date for the purposes of determining whether ... Manzanares complied with Utah law is February 20, 2008, when ... Terry signed the Consent."

■ ¶ 23 Manzanares appealed the district court's determination that Terry's consent was valid and that he was aware of qualifying circumstances.[2] We will not disturb that court's findings of fact "unless they are ... clearly erroneous." *State, Dep't of Human Servs. ex rel. Parker v. Irizarry*, 945 P.2d 676, 678 (Utah 1997) (internal quotation marks omitted). To the extent our resolution of those facts depends on our construction of the relevant adoption statutes, however, we review the district court's statutory interpretation for correctness. *Cf. H.U.F. v. W.P.W.*, 2009 UT 10, ¶ 19, 203 P.3d 943.

## II

■ ¶ 24 Subject to two narrow exceptions, an unmarried biological father's consent to the adoption of his child who is six months of age or younger is not required under Utah law unless the father complies with Utah Code section 78B–6–121(3) (Section 121(3)). Section 121(3), among other things, requires the father to "initiate[ ] proceedings in a district court of Utah to establish paternity," Utah Code § 78B–6–121(3)(a), "prior to the time the mother executes her consent for adoption," *id.* § 78B–6–121(3).[3] The district court noted that "it does not appear that [Manzanares] ha[d] taken any such steps" to comply with Section 121(3) prior to February 20, 2008, the day Terry consented before Judge Hilder to the adoption of her three-day-old child.

■ ¶ 25 Manzanares nevertheless argues that his consent was required for two independent reasons.[4] He first argues that Ter-

---

2. After oral argument, we requested supplemental briefing regarding the applicability of a federal statute—the Parental Kidnaping Prevention Act (PKPA), 28 U.S.C. § 1738A—to the facts of this case. Prior to our supplemental briefing order, neither party had raised the PKPA before the district court or on appeal. Thus, in light of our decision in *J.M.W. v. T.I.Z. (In re Adoption of Baby E.Z.)*, 2011 UT 38, 266 P.3d 702, we hold that the parties forfeited any argument regarding the PKPA.

3. Utah Code section 78B–6–121(3) provides in full:

> Except as provided in Subsection 78B–6–122(1), and subject to Subsection (5), with regard to a child who is six months of age or less at the time the child is placed with adoptive parents, consent of an unmarried biological father is not required unless, prior to the time the mother executes her consent for adoption or relinquishes the child for adoption, the unmarried biological father:
> (a) initiates proceedings in a district court of Utah to establish paternity under Title 78B, Chapter 15, Utah Uniform Parentage Act;
> (b) files with the court that is presiding over the paternity proceeding a sworn affidavit:
> (i) stating that he is fully able and willing to have full custody of the child;
> (ii) setting forth his plans for care of the child; and
> (iii) agreeing to a court order of child support and the payment of expenses incurred in connection with the mother's pregnancy and the child's birth;
> (c) consistent with Subsection (4), files notice of the commencement of paternity proceedings, described in Subsection (3)(a), with the state registrar of vital statistics within the Department of Health, in a confidential registry established by the department for that purpose; and
> (d) offered to pay and paid a fair and reasonable amount of the expenses incurred in connection with the mother's pregnancy and the child's birth, in accordance with his financial ability, unless:
> (i) he did not have actual knowledge of the pregnancy;
> (ii) he was prevented from paying the expenses by the person or authorized agency having lawful custody of the child; or
> (iii) the mother refuses to accept the unmarried biological father's offer to pay the expenses described in this Subsection (3)(d).

4. Manzanares also seeks to challenge Section 121(3) on constitutional grounds, asserting that it fails to give full faith and credit to paternity actions initiated in another state as required, according to Manzanares, by article IV, section 1 of the United States Constitution. We decline to reach this issue because it was not asserted in the proceedings below and accordingly was not

ry's consent was voided upon Judge Faust's vacatur of Judge Hilder's acceptance of the consent. On this point, Manzanares challenges the district court's ruling that the relevant statute requires an unmarried biological father to assert his rights in Utah prior to the time the mother "executed the consent" (February 20, 2008), "not the time that the consent was accepted by the Court."

¶ 26 Alternatively, Manzanares argues that he qualifies for one of the two exceptions to the strict-compliance requirements of Section 121(3). Because he did not know (and could not have known through "reasonable diligence") of a "qualifying circumstance" before February 20, 2008, the date Terry signed her consent, Manzanares argues that his consent to adoption was required by statute. Under Utah law, the consent of an unmarried biological father who has failed to comply with Section 121(3) is still required where

(A) the unmarried biological father did not know, and through the exercise of reasonable diligence could not have known, before the time the mother executed a consent to adoption or relinquishment of the child for adoption, that a qualifying circumstance existed;

(B) before the mother executed a consent to adoption or relinquishment of the child for adoption, the unmarried biological father fully complied with the requirements to establish parental rights in the child, and to preserve the right to notice of a proceeding in connection with the adoption of the child, imposed by:

(I) the last state where the unmarried biological father knew, or through the exercise of reasonable diligence should have known, that the mother resided in before the mother executed the consent to adoption or relinquishment of the child for adoption; or

(II) the state where the child was conceived; and

(C) the unmarried biological father has demonstrated, based on the totality of the circumstances, a full commitment to his parental responsibilities, as described in Subsection (1)(b).

UTAH CODE § 78B–6–122(1)(c)(i).[5]

¶ 27 Citing Manzanares's Colorado court filings detailing his belief that Terry planned to flee to Utah to surreptitiously give up the child for adoption, the district court held either that Manzanares knew or through "reasonable diligence" should have known of one or more qualifying circumstance. Manzanares counters that although he believed Terry would flee to Utah, Terry mollified those concerns when she denied, in Colorado court filings, any such intention. In light of Terry's denials, Manzanares insists that he was unaware of any qualifying circumstance.

¶ 28 The parties' arguments implicate two issues on appeal: (A) the effect (if any) of Judge Faust's vacatur on Terry's consent to adoption, and (B) whether Manzanares was unaware (and reasonably could not have become aware) of a qualifying circumstance. We find that Terry's consent was valid, but we reverse the district court's determination that Manzanares knew or reasonably should have known of a qualifying circumstance. Accordingly, we remand to the district court to determine (1) whether Manzanares fully complied with Colorado's requirements to establish his parental rights in Baby B., and to preserve the right to notice of a Colorado adoption proceeding, *id.* § 78B–6–122(1)(c)(i)(B); and (2) whether Manzanares demonstrated a full commitment to his parental responsibilities, *id.* § 78B–6–122(1)(c)(i)(C).

preserved for appeal. *See Badger v. Brooklyn Canal Co.*, 966 P.2d 844, 847 (Utah 1998) (party must give trial court an opportunity to rule on an issue to preserve it for appellate review).

5. The second exception to Section 121(3) applies where an "unmarried biological father knew, or through the exercise of reasonable diligence should have known, before the time the mother executed a consent to adoption ... that a qualifying circumstance existed," UTAH CODE § 78B–6–

122(1)(c)(ii)(A), and he complied with Section 121(3) either "20 days after" he became aware of the qualifying circumstance, or before "the time that the mother executed" her consent to adoption, whichever comes later, *id.* § 78B–6–122(1)(c)(ii)(B). The district court found that "Manzanares did not file a Utah paternity action until September 10, 2008, nearly seven months after the child's birth." Accordingly, this second exception does not apply in this case.

## A. Validity of Terry's Consent

¶ 29 The district court vacated Judge Hilder's acceptance of Terry's consent, but later decided that the vacatur did not render Terry's consent invalid for purposes of the relevant adoption statutes. We agree that Terry's consent to adoption is valid because under the relevant statutes the judge's only role is to ensure that the birth mother consented freely and voluntarily. Because there is no contention that Terry did not freely and voluntarily consent to the adoption of Baby B., we find Terry's consent valid and reject Manzanares's attempts to subvert it.

¶ 30 Under Utah law, a "consent or relinquishment by a birth mother" must be signed before certain statutorily authorized individuals, including "a judge of any court that has jurisdiction over adoption proceedings." *Id.* § 78B–6–124(1)(a). The judge "shall certify to the best of his information and belief that the person executing the consent or relinquishment has read and understands the consent or relinquishment and has signed it freely and voluntarily." *Id.* § 78B–6–124(4). Such a "consent or relinquishment is effective when it is signed and may not be revoked." *Id.* § 78B–6–126.

¶ 31 Terry signed her consent before Judge Hilder on February 20, 2008. Judge Hilder certified that Terry signed the consent freely and voluntarily. Yet in light of Terry's alleged "deceptions and misrepresentations to the Courts," the district court "vacate[d] Judge Hilder's acceptance of Ms. Terry's Consent." The court reasoned as follows:

> Our judicial system requires that all individuals appearing before the court, whether parties, witnesses, or counsel, be candid with the Court and provide it ˙with an accurate picture of the issues that may be present. This is functionally important and precludes one party from gaining an unfair advantage over the other party or precluding that party's full participation. . . .

> The Court further finds and holds that it would be a gross injustice and miscarriage of justice to allow Ms. Terry's and [the Byingtons'] action to defeat Mr. Manzanares'[s] legitimate claim to his child and to challenge the adoption under these circumstances.

¶ 32 Despite vacating Judge Hilder's acceptance of Terry's consent, the district court "did not vacate or set aside the Consent itself." Rather, the court "contemplated the re-filing of the Consent so that the process of judicial acceptance, with all of the relevant information being disclosed, could be renewed." In a later memorandum decision, however, the court held that its earlier vacatur "did not render the Consent void from its inception." This is because, the court reasoned, Utah Code sections 78B–6–122(1)(c)(i)(A) and (B) speak of the date on which a mother "executed" a consent to adoption, not the date on which that consent was accepted by a trial judge. "Consequently," the court resolved, "the operative date for the purposes of determining whether Mr. Manzanares complied with Utah law is February 20, 2008, when Ms. Terry signed the Consent."

¶ 33 Manzanares disputes the district court's interpretation of the word "executed" in the adoption statutes. According to Manzanares, a consent to adoption is valid only after it has been accepted by a judge. But Manzanares cites no relevant authority for this position.[6] The Byingtons, in contrast, argue that the district court's action vacating Judge Hilder's acceptance was improper in the first place, because the only role a judge plays when a mother gives consent for an adoption is to ensure that the consent does

---

**6.** Manzanares cites *In re Adoption of D.*, 122 Utah 525, 252 P.2d 223 (1953), for the proposition that a judge must accept a mother's consent for the consent to be valid. But that case says nothing of the effect of a district court's vacatur of a mother's consent to adoption. In *In re Adoption of D.*, we considered a scenario where prospective adoptive parents were promised that "if they would assume parental responsibility and take care of" a child, they could adopt the child. *Id.* at 228. We held that "[a]fter acceptance" of the offer by the adoptive parents (by fulfilling the relevant parental responsibilities), "such a contract is enforceable against the adopting parents and ought to be enforceable by them." *Id.* at 229. The case never mentions the sort of statutory consent to an adoption at issue here.

not result from coercion but is freely and voluntarily given. Absent any contention that Terry did not freely and voluntarily consent to the adoption, the Byingtons argue, the district court lacked authority to vacate Judge Hilder's acceptance.

¶ 34 Whether or not the district court had authority to vacate Judge Hilder's acceptance, we conclude that the district court did not vacate anything of relevance to this case. Utah law requires a mother to sign her consent before a judge who "cer-tif[ies] to the best of his information and belief that the person executing the consent or relinquishment has read and understands the consent or relinquishment and has signed it freely and voluntarily." UTAH CODE § 78B–6–124(1), (4). Such a consent "is effective when it is signed and may not be revoked." *Id.* § 78B–6–126. The statutes never mention a judge's "acceptance" of the consent—let alone acceptance based on full disclosure to the court—as a prerequisite to the execution of a valid consent. The district court never questioned that Terry freely and voluntarily signed her consent, only that she did not divulge to the court that Manzanares had filed a paternity action in Colorado. The district court's vacatur of Judge Hilder's acceptance of the consent is thus of no legal significance to the issues in this appeal.

¶ 35 The district court's analysis also rested on a mistaken premise—that pa-rental-rights proceedings in another state affect the validity of a mother's consent in this state. Under the Adoption Act, a birth mother has an absolute right to consent to an adoption, so long as she understands what she is doing and does so freely and voluntarily. *See id.* § 78B–6–124(4). And the Act specifically contemplates the possibility that an unmarried biological father may attempt to secure his parental rights in another state. *See id.* § 78B–6–122(1)(c)(i)(B). Doing so does not prevent the mother from executing a consent to adoption in Utah. Nor is the father excused from asserting his rights in Utah by the mother's purported failure to disclose. *See id.* § 78B–6–106(1). Rather, the father "is considered to be on notice that a pregnancy and an adoption proceeding regarding the child may occur," and "has a duty to protect his own rights and interests." *Id.* § 78B–6–110(1)(a).

¶ 36 Thus, the district court's vacatur of Judge Hilder's "acceptance" of Terry's consent was legally baseless. Terry's consent to adoption on February 20, 2008, was therefore valid.

### B. Qualifying Circumstances

¶ 37 Under the applicable statute, a finding that Manzanares's consent to Baby B.'s adoption was required depends first on a conclusion that he did not know, and through the exercise of reasonable diligence could not have known, of a qualifying circumstance prior to February 20, 2008. There are four qualifying circumstances set forth in the statute that may arise "at any point during the time period beginning at the conception of the child and ending at the time the mother executed a consent to adoption or relinquishment of the child for adoption":

(i) the child or the child's mother resided, on a permanent or temporary basis, in the state;

(ii) the mother intended to give birth to the child in the state;

(iii) the child was born in the state; or

(iv) the mother intended to execute a consent to adoption or relinquishment of the child for adoption:

 (A) in the state; or

 (B) under the laws of the state.

*Id.* § 78B–6–122(1)(a).

¶ 38 "Based on Mr. Manzanares'[s] filings in Colorado,"[7] the district court concluded that "prior to February 20, 2008, Mr. Manzanares knew, or through the exercise of rea-

---

7. The district court also vaguely referred to "other evidence adduced at the evidentiary hearing" to support its conclusion, but our own review of the evidentiary hearing discloses no evidence of Manzanares's knowledge other than that set forth in the Colorado court filings. In fact, summarizing the testimony of Terry and the Bying-tons, the district court noted that neither Terry nor the Byingtons informed Manzanares of their plans. The trial judge did not, nor has either party attempted to, identify what "other evidence" the court had in mind, and we know of no other evidence in the record.

sonable diligence should have known" of any or all of the second, third, and fourth qualifying circumstances—"that (i) Ms. Terry intended to give birth in Utah, (ii) the child would be born in Utah, or (iii) Ms. Terry intended to execute a consent to adoption of the child in Utah or under the laws of Utah." Although the district court did not evaluate the first qualifying circumstance—residence in Utah—the Byingtons argue on appeal that Manzanares knew or should have known that Terry resided in Utah. Accordingly, we must determine whether the record supports the court's conclusion that at least one of the qualifying circumstances provisions identified by the district court was met. We also must independently evaluate, based on the record, whether Manzanares did not know and could not have known through reasonable diligence that Terry resided in Utah before giving consent to the adoption.

¶ 39 In the paragraphs below, we articulate the varying standards of review that apply to the findings explicit and implicit in the district court's above conclusions. We then evaluate those conclusions under the appropriate standards of review, concluding that the district court applied incorrect legal standards in finding in Terry's favor under the qualifying circumstances provision. We accordingly reverse under the legal standards as clarified below. Finally, we evaluate the Byingtons' claim that Manzanares was aware that Terry resided in Utah, ultimately rejecting the underlying factual predicate that Terry in fact resided in the state.

### 1. Standards of Review

■■■ ¶ 40 The standard of appellate review varies depending on the nature of the lower court's analysis. A key question is whether the trial court's decision qualifies as a finding of fact, a conclusion of law, or a determination of a mixed question of law and fact. Findings of fact are entitled to the most deference. Those findings "entail[ ] the empirical, such as things, events, actions, or conditions happening, existing, or taking place, as well as the subjective, such as state of mind." *State v. Pena,* 869 P.2d 932, 935 (Utah 1994).[8] Since the lower court often has a comparative advantage in its firsthand access to factual evidence, and because there is no particular benefit in establishing settled appellate precedent on issues of fact, there is a potential downside and no significant upside to a heavy-handed, fresh reexamination of the facts on appeal. Such findings are accordingly overturned only when "clearly erroneous." *See, e.g., State v. Tripp,* 2010 UT 9, ¶ 23, 227 P.3d 1251.

■■■ ¶ 41 Conclusions of law are at the other end of the spectrum. No deference is given to the lower court's analysis of abstract legal questions. This is because the lower court has no comparative advantage in resolving legal questions and settled appellate precedent is of crucial importance in establishing a clear, uniform body of law. Our review of conclusions of law is accordingly de novo. We take a fresh look at questions of law decided by a lower court, according no deference to its resolution of such issues. *See, e.g., H.U.F. v. W.P.W.,* 2009 UT 10, ¶ 19, 203 P.3d 943.

■■ ¶ 42 Mixed questions fall somewhere in the twilight between deferential review of findings of fact and searching reconsideration of conclusions of law. On mixed questions—involving application of a legal standard to a set of facts unique to a particular case [9]—our review is sometimes deferential and sometimes not. The applicable standard depends on the nature of the issue and the marginal costs and benefits of a less deferential, more heavy-handed appellate touch. Thus, we have sometimes applied a deferential standard of review on mixed questions, and sometimes reviewed mixed determinations *de novo,* depending on:

(1) the degree of variety and complexity in the facts to which the legal rule is to be applied; (2) the degree to which a trial court's application of the legal rule relies

---

8. *See also* J. Thayer, A Preliminary Treatise on Evidence at the Common Law 191 (1898) ("Nothing is a question of fact which is not a question of the existence, reality, truth of something; of the *rei veritas*.").

9. *Pena,* 869 P.2d at 936 (mixed questions involve a determination "whether a given set of facts comes within the reach of a given rule of law").

on facts observed by the trial judge, such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts; and (3) other policy reasons that weigh for or against granting discretion to trial courts. *State v. Levin,* 2006 UT 50, ¶ 25, 144 P.3d 1096 (internal quotation marks omitted). The deference given in these circumstances rests on the notion that the mixed finding is *not* "law-like" because it does not lend itself to consistent resolution by a uniform body of appellate precedent, and/or on the premise that the mixed finding *is* "fact-like" because the trial court is in a superior position to decide it.

¶ 43 An example of a determination of such a mixed question would be a finding of negligence in a personal injury suit arising out of an automobile accident. The particular facts and circumstances of the drivers' conduct are likely to be "so complex and varying that no rule adequately addressing the relevance of all these facts can be spelled out," *Pena,* 869 P.2d at 939, so there would be little upside to a heavy-handed, searching reconsideration of a trial court's finding of negligence in a particular case. By the same token, the trial judge's negligence determination would often be affected by his observation of a competing "witness's appearance and demeanor" on matters "that cannot be adequately reflected in the record available to appellate courts." *Levin,* 2006 UT 50, ¶ 25, 144 P.3d 1096 (inter-

nal quotation marks omitted). If so, a non-deferential appellate review of a negligence finding would not only have little upside, but would also have significant downside since the appellate court would be in an inferior position to review the "correctness" of the trial judge's decision. For these reasons a negligence finding is a classic finding that, while mixed, calls for deference to the lower court.[10]

■ ¶ 44 Some mixed findings, on the other hand, call for non-deferential appellate review. Such findings are those where a fresh appellate reconsideration of the issues present little downside and significant upside—as on issues that are "law-like" in lending themselves to consistent resolution by uniform precedent and not "fact-like" because the appellate court is in as good a position as the trial court to resolve the issue. A paradigmatic example here would be a finding that a common set of recurring law enforcement practices qualifies as a "reasonable" search or seizure. The upside of de novo appellate review is apparent, in that both law enforcement and the general public ought to be able to rely on a consistent rule established by set appellate precedent as to the reasonableness of certain law enforcement procedures.[11] And the downside is minimal in a case involving common, recurring practices, where the decision will turn on the general reasonableness of those practices and not so much on the demeanor or credibility of a particular witness.[12] This is

---

10. *See Bowers v. Union Pac. R. Co.,* 4 Utah 215, 7 P. 251, 253 (Utah Terr. 1885) ("Negligence is generally a mixed question of law and fact, and sometimes, although all the facts are admitted, the question arises whether the act imputed as negligence was such as persons of ordinary prudence would have performed under the circumstances, and, unless the question is clear of all doubt, it is the duty of the court to leave it with the jury, and not to disturb their finding.").

11. *Cf. State v. Thurman,* 846 P.2d 1256, 1271 (Utah 1993) ("On the one hand, the application of the clearly erroneous standard to [a] trial court's factual findings recognizes the trial court's advantaged position in judging credibility and resolving evidentiary conflicts. On the other hand, the application of the correct[ness] standard to the trial court's ultimate voluntariness determination acknowledges that a single trial judge is in an inferior position to determine what

the legal content of voluntariness should be and that a panel of appellate judges, with their collective experience and their broader perspective, is better suited to that task. Also, the decision of the appellate panel is published, thereby providing state-wide standards that guide law enforcement and prosecutorial officials. Therefore, while the trial court is primarily concerned with the proper resolution of factual issues under the controlling law, the appellate court addresses itself to the clarity and correctness of the developing law in order to provide unambiguous direction to those whose further rights and responsibilities are affected." (citations omitted)).

12. That is not to say that a reasonableness determination will never involve pure findings of fact subject to a deferential standard of review. Before reaching the ultimate determination on reasonableness, the district judge may well make intermediate findings of empirical fact on issues

why a mixed finding of reasonableness is typically subject to a non-deferential standard of review.[13]

¶ 45 This background sets the stage for an evaluation of the appropriate standards of review of the district court's findings in this case. A trial court's application of the qualifying circumstances statute in a given case may involve findings of fact subject to considerable deference. If a trial court found that a father "knew" that the mother intended to give birth in Utah (or knew that the baby had been born there), for example, that would be a finding of fact entitled to deference that would be reversible only if clearly erroneous. This is because knowledge is a "subjective . . . state of mind," which normally is a factual question. *See Pena*, 869 P.2d at 935.

¶ 46 Other findings under the qualifying circumstances statute would involve mixed questions of law and fact. A finding that "through the exercise of reasonable diligence" a biological father "could not have known, before the time the mother executed a consent to adoption or relinquishment of the child for adoption, that a qualifying circumstance existed" involves a mixed question of law and fact because it essentially concludes that "a given set of facts comes within the reach of a given rule of law." *Id.* at 936. Such a mixed finding under the qualifying circumstances provision is one that would ordinarily merit some deference on appeal. An evaluation of whether a biological father "could not have known" of a qualifying circumstance through the exercise of "reasonable diligence" typically would be one that is "so complex and varying that no rule adequately addressing the relevance of all these

facts can be spelled out." *Id.* at 939. Assuming a district court applied the correct legal standard in making a mixed finding under the qualifying circumstances provision, such a mixed finding typically would be entitled to deference and would be properly affirmed on appeal if not clearly erroneous.

¶ 47 Finally, we note that the factual and mixed findings described above may contain embedded legal questions. "[B]ecause appellate courts have traditionally been seen as having the power and duty to say what the law is and to ensure that it is uniform throughout the jurisdiction," *id.* at 936, we must be vigilant in our review of both purely factual and mixed findings to ensure that they are based on correct legal principles. If a hypothetical statute were to impose penalties for the wearing of a red shirt, a trial court could be called upon to make a factual finding on the empirical question of the color of an individual party's shirt. But such a finding could also entail an embedded legal conclusion, such as whether fuchsia shirts are prohibited. Our review of a court's decision under this statute would defer to the factual finding on the empirical question of the color of a particular shirt. But we would give no deference on the legal question of the meaning of the statutory term "red," deciding for ourselves whether fuchsia shirts are covered. Thus, if a trial court finds that a particular fuchsia shirt is effectively a red one covered by the statute, the applicable standard of review would require us to distinguish the factual finding on the empirical question of the shirt's color from the legal conclusion on what is meant by the term "red."

such as the methods and timing of a search, the considerations leading up to it, or who said what to whom (and when). Those would be classic findings of fact on which the district judge would be entitled to deference.

13. *See State v. Worwood*, 2007 UT 47, ¶ 11, 164 P.3d 397 ("In cases involving Fourth Amendment questions under the United States Constitution, we review mixed questions of law and fact under a correctness standard in the interest of creating uniform legal rules for law enforcement."); *State v. Levin*, 2006 UT 50, ¶ 23, 144 P.3d 1096 ("[W]ith regard to certain mixed questions where uniform application is of high impor-

tance, as in the context of Fourth Amendment protections, we have held that policy considerations dictate that the application of the legal concept should be strictly controlled by the appellate courts. Thus, if we determine that society's interest in establishing consistent statewide standards outweighs other considerations, we grant no discretion to the trial court, and we review the mixed question for correctness."(footnote omitted)); *cf. Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (determinations of reasonable suspicion and probable cause are mixed questions of law and fact which are reviewed de novo).

### 2. The District Court's Findings Regarding the Second, Third, and Fourth Qualifying Circumstances

¶ 48 The district court's finding that Manzanares knew or should have known of one of three qualifying circumstances is not entitled to deference on appeal for three reasons. First, it is impossible to cleanly evaluate the district court's finding that Manzanares knew *or* should have known of a qualifying circumstance because its analysis effectively fused underlying questions of fact, law, and mixed questions. Second, to the extent the court effectively answered the factual question that Manzanares "knew" of a qualifying circumstance, that conclusion appears to have been based on the incorrect legal conclusion that belief is equivalent of knowledge. Finally, under a correct reading of the statute, the evidence in the record sustains only one conclusion—that Manzanares did not know and could not have known of a qualifying circumstance in light of Terry's deception before she executed her consent to adoption.

¶ 49 Although the factual and mixed questions inherent in the qualifying circumstances provision are central to its operation, and often dependent on evidence that the trial court has firsthand experience with, we ultimately conclude that remanding to allow the district court to make these findings would be fruitless, and therefore simply reverse. In so doing, we offer some points of clarifica-

tion on the applicable legal standards that govern under the statute.

¶ 50 We hasten to add that our goal in this endeavor bears no relation to the motive attributed to us by the dissent. As explained in detail below, our approach has nothing to do with substituting our "own sense of what is fair" for the "legislature's policy choices." *Infra* ¶ 94. Our goal, rather, is to give the Adoption Act our best interpretation, giving meaning to each of its provisions in a way that credits the plain language of the statute. The approach set forth below is aimed at doing so, not, as the dissent asserts, at achieving "palatable" results or condemning "fraudulent and outrageous" conduct. *Infra* ¶ 94.[14]

(a)

¶ 51 The district court did not make a separate finding on the factual question whether Manzanares *knew* of one of the qualifying circumstances. Nor did it make a separate finding on the mixed question whether Manzanares "could have known" through "reasonable diligence" of a qualifying circumstance. Instead, the district judge simply concluded that the "qualifying circumstances" provision of the statute was satisfied in this case—that Manzanares knew *or* reasonably should have known of one of the three qualifying circumstances enumerated in the court's order (intent to give birth in Utah, birth in Utah, or intent to execute a consent to adoption in Utah).[15]

---

**14.** The dissent's contrary construction rests largely on what it perceives as the legislature's purpose in enacting the Adoption Act, which in its view is to "ensur[e] finality and permanence in adoptive placements." *Infra* ¶ 99. But the statute surely has other purposes that merit our consideration. It is worth recalling that "'[l]egislation is rarely aimed at advancing a single objective at the expense of all others." *Myers v. Myers*, 2011 UT 65, ¶ 27, 266 P.3d 806; *see also Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 23 n. 6, 248 P.3d 465 (explaining "that most statutes represent a compromise of purposes advanced by competing interest groups, not an unmitigated attempt to stamp out a particular evil"). "More often, statutes are a result of a legislative give-and-take that balances multiple concerns." *Myers*, 2011 UT 65, ¶ 27, 266 P.3d 806. That is certainly true of the Adoption Act, whose text plainly indicates a concern not only with assuring the finality of adoptions but also with protecting the rights of biological fathers

who demonstrate "timely and full commitment to the responsibilities of parenthood" and "acquire[ ] constitutional protection" of their interest in their child. Utah Code § 78B–6–102(5)(e). Our construction of the statute must account for this and all other policies and purposes addressed by the statutory text, not just the general purpose cited by the dissent.

**15.** The district court employed the "should have known" formulation with respect to Manzanares's knowledge of a qualifying circumstance rather than the "could not have known" language prescribed in section 122(1)(c)(i). *Compare id.* § 78B–6–122(1)(c)(i)(A) ("did not know, and through the exercise of reasonable diligence could not have known") *with id.* § 78B–6–122(1)(c)(ii)(A) ("knew, or through the exercise of reasonable diligence should have known"). The dissent follows suit. *See, e.g., infra* ¶¶ 105–07, 116–21, 149, 159. The "could" formulation we

¶ 52 The dissent implies that the district court's analysis is a factual finding worthy of deference, but it is not. A determination that Manzanares *knew* that Terry intended to give birth in Utah (or knew that the baby had been born there) would be a finding of fact subject to the deferential clear error standard of review. But that is not what the district court found. Instead, by concluding generally that the qualifying circumstances condition was met, the court effectively packaged factual findings (of knowledge) with mixed questions of fact and law (that "reasonable diligence" would have led to knowledge), labeling the whole thing a "finding of fact." Because the district court simply concluded that the range of facts and circumstances before the court satisfied the qualifying circumstances provision of the statute, it failed adequately to analyze the factual and legal basis for concluding that Manzanares knew of a qualifying circumstance or, separately, that "reasonable diligence" would have led him to knowledge. The court never rendered a separate mixed finding or a separate finding of empirical fact or state of mind. Thus, there is no factual or even mixed finding for us to defer to, and thus no basis for deference to the trial court's decision.

(b)

¶ 53 The district court's finding was also corrupted by an embedded legal error. In expressly relying on Manzanares's allegations in his Colorado pleadings, the court effectively adopted a legal premise that a *belief* expressed in a court pleading is the equivalent of knowledge.

¶ 54 That premise was erroneous. Knowledge and belief are distinct states of mind.[16] And the Adoption Act expressly requires proof of the former. An unmarried biological father's consent is required where he "did not *know,* and through the exercise of reasonable diligence could not have *known* " that a "qualifying circumstance" existed. UTAH CODE § 78B–6–122(1)(c)(i)(A) (emphases added).[17]

¶ 55 The statute's inquiry into what the father *knew* or *could have known* clearly implies proof beyond mere belief.[18] "[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation. The term 'applies to any body of known facts or to any body of ideas inferred from such facts

utilize throughout this opinion is correct as it is the language employed in the operative section. As we note above, *supra* ¶ 26 n. 5, this case arises under section 122(1)(c)(i)(A) (which uses the "could not have known" formulation) not under section 122(1)(c)(ii)(A) (which speaks in terms of what the father "should have known").

16. *See Iron Silver Mining Co. v. Reynolds,* 124 U.S. 374, 384, 8 S.Ct. 598, 31 L.Ed. 466 (1888) ("There may be difficulty in determining whether ... knowledge in a given case was had; but between mere belief and knowledge there is a wide difference. The court could not make them synonymous by its charge and thus in effect incorporate new terms into the statute."); *Tracerlab, Inc. v. Indus. Nucleonics Corp.,* 313 F.2d 97, 102 (1st Cir. 1963) ("Suspicion and knowledge are poles apart on a continuum of understanding.... Suspicion differs from knowledge in that one who has knowledge of a fact has no substantial doubts as to its existence, whereas one may have suspicions although he realizes that there is a substantial chance of its nonexistence." (internal quotation marks omitted)); *Jameson v. Jameson,* 176 F.2d 58, 60 (D.C. Cir. 1949) ("Belief, no matter how sincere, is not equivalent to knowledge.").

17. The district court's global finding also contained a second embedded legal conclusion—in its statement of the statute's third qualifying circumstance. Instead of concluding that Manzanares knew or reasonably should have known that "the child was born" in Utah, UTAH CODE § 78B–6–122(1)(a)(iii), the district court's finding phrased this standard in terms of whether he knew or reasonably should have known that the child "would be born in Utah." The question is not whether Manzanares *believed* that the child *would* be born in Utah, but whether he *knew* that the child, after the fact, *had* been born in Utah. Remand on this factual question is unnecessary, since the answer to that question clearly is no. Terry concealed the birth of the child from Manzanares (and the Colorado court) after the fact. Manzanares was unaware that the child had been born, let alone born in Utah, until several days *after* Terry gave her consent to adoption.

18. Our approach does not read the "could have known" standard out of the statute, as the dissent suggests. *Infra* ¶ 123. It simply underscores the statutory standard, which turns on what the biological father knew or could have known, and not, as the dissent advocates, on what a "reasonable person" would have "conclude[d]" or "inferred." *Infra* ¶¶ 155, 159.

or accepted as truths on good grounds.' " [19] Thus, in context, the statute requires consent by the father unless he knew or could have known—and not merely believed—of a qualifying circumstance (residence in the state, intent to give birth in the state, the child's birth in the state, or intent to consent to adoption in the state).

¶ 56 Knowledge of such circumstances implies that the father "accepted" them "as truths on good grounds." It would not be sufficient, therefore, for the father simply to accept the subjective possibility of the likelihood of such event taking place. If the father is told by the mother that she intended to give birth in the state or consent to adoption there, that would give the father "good grounds" for knowledge of those qualifying circumstances. But mere suspicion of such intent would fall short.

¶ 57 This standard is generally consistent with the approach set forth in our opinion in *O'Dea v. Olea*, 2009 UT 46, 217 P.3d 704. An "unambiguous notification" by

the mother of a qualifying circumstance is evidence of a father's knowledge. *Id.* ¶ 43. The law requires proof of knowledge and not mere subjective belief. Proof of knowledge, moreover, may be established on the basis of an "unequivocally communicated" statement by the mother to the father, *id.* ¶ 42, so long as that statement is sufficient to sustain a finding of knowledge and not mere suspicion or belief.[20]

¶ 58 The dissent complains that this standard is "impossible to satisfy in practice," *infra* ¶ 96, but experience and common sense teach otherwise. It is true that the child's mother is under no obligation to share information regarding her intent, but there are good reasons for her to communicate with the father of her child and she will often do so. In fact, cases heard by this court confirm that the mother often will communicate her intentions to the father,[21] and when that happens the father's knowledge of her intent will be established.[22]

---

**19.** *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (quoting Webster's Third International Dictionary 1252 (1986)).

**20.** This is not to say, as the dissent charges, *infra* ¶ 119, that a father can only acquire knowledge of a mother's intent through "unequivocal communication." Rather, we simply clarify the position of our decision in *O'Dea* within the correct legal standard: if a father knows or could have known through the exercise of reasonable diligence of a qualifying circumstance, he must strictly comply with the Adoption Act. The actual source of knowledge is immaterial; whether the father gains it (or could have gained it) by way of an unequivocal communication from the mother, through information gleaned from a third party, by way of discovered documents, or via any myriad of alternative avenues, the result is the same.

**21.** *See, e.g., O'Dea*, 2009 UT 46, ¶¶ 5–6, 217 P.3d 704 (a birth mother contacted the natural father and indicated that she "miscarried the child," but later called to inform him that the child would be born, that she was in Utah, and that she expected him to make future child support payments); *J.S. v. P.K. (In re I.K.)*, 2009 UT 70, ¶ 2, 220 P.3d 464 ("Birth Mother contacted the Natural Father [weeks after their relationship ended] to inform him that she was pregnant and intended to have an abortion"); *Osborne v. Adoption Ctr. of Choice*, 2003 UT 15, ¶ 4, 70 P.3d 58 (following delivery, a birth mother called the natural father to inform him that "she had borne

a son, [and] that she had decided not to place the child for adoption in Utah...."); *Swayne v. L.D.S. Soc. Servs.*, 795 P.2d 637, 639 (Utah 1990) (a birth mother told the natural father that "her parents wanted her to relinquish the child for adoption."); *In re Adoption of Baby Boy Doe*, 717 P.2d 686, 687 (Utah 1986) (although living in separate states during much of the pregnancy, unwed mother and father spoke "on the phone regularly" and intended to marry, before the mother ultimately placed the child for adoption); *Sanchez v. L.D.S. Soc. Servs.*, 680 P.2d 753, 755 (Utah 1984) (while living with the natural father, a birth mother told him that "she might give the baby up for adoption.").

**22.** The dissent attempts to undermine our standard with the suggestion that "*none* of the cases cited by the majority would meet its 'unequivocal communication' standard." *Infra* ¶ 122. That is incorrect, and in any event it proves nothing. First, at least one of the cited cases does demonstrate a communication from a mother that would establish knowledge on the part of a father. *See O'Dea*, 2009 UT 46, ¶¶ 5–6, 217 P.3d 704 (mother clearly indicated to the biological father that she intended to give birth to the child and that she was in Utah). In any event, the cases are cited not to illustrate instances where the knowledge standard would be met, but simply to demonstrate that birth mothers will often share their intent with biological fathers, whether solicited or not. And a paucity of cases involving actual knowledge would tell us very little. A father who had demonstrable knowledge of a

¶ 59 The dissent also complains that the approach we take today is inconsistent with the standard set forth in *O'Dea*. *Infra* ¶¶ 111–114. We acknowledge the need to refine and clarify the *O'Dea* standard, and we do so here in a number of respects. For the most part, however, our decision here is consistent with *O'Dea*, as explained above.

¶ 60 There is one aspect of *O'Dea* that is arguably incompatible with the approach we adopt today, and that is its characterization of the statutory standard as turning on proof of "sufficient notice" or "inquiry notice." 2009 UT 46, ¶¶ 39–42, 217 P.3d 704. In context, the reference to "notice" could simply be understood as a shorthand for a showing that the father knew or reasonably could have known. In that sense, the *O'Dea* opinion is correct, and we reaffirm it. There is another sense of "notice," however, that is potentially confusing and that we accordingly disavow. Given our construction of the notion of "knowledge," it cannot be enough to simply establish that the father had "notice" in the sense of suspicion sufficient to trigger a further inquiry. To the extent *O'Dea* can be read to suggest that, we disavow it as overtaken by our explanation of the knowledge requirement set forth above.[23]

¶ 61 Next, the dissent challenges the knowledge inquiry as we have defined it as irreconcilable with the Adoption Act's proviso that a mother's "fraudulent representation is not a defense to strict compliance with the requirements of this chapter." *Infra* ¶¶ 130–31 (quoting UTAH CODE § 78B–6–106). In the dissent's view, this language renders a mother's statements to an unmarried biological father inadmissible and irrelevant to the statutory inquiry into whether the father knew or could have known of a qualifying circumstance. Thus, the dissent would disregard evidence of Terry's statements to Man-

zanares and rejects our approach as advocating a " 'fraudulent concealment' exception . . . at odds with the legislative intent that the burden of fraud is best borne by the father." *Infra* ¶¶ 126, 131.

¶ 62 This mischaracterizes our approach and advocates an inquiry that would thwart any reasonable inquiry into a father's knowledge. If the dissent's approach were taken seriously, no informed examination of a father's knowledge could ever be undertaken, since such knowledge of the mother's intentions and actions would almost always be based on statements by the mother. Thus, the dissent would completely undermine any reasonable inquiry into the father's knowledge of qualifying circumstances by deeming the mother's statements irrelevant on the ground that the father bears the risk of her fraud. That approach is wrong because it renders meaningless the statutory inquiry into knowledge, which necessarily implies a consideration of the mother's statements as to her intentions and actions.

¶ 63 We read the statute to call for an evaluation of any evidence relevant to the father's knowledge, including statements (fraudulent or otherwise) by the mother. This inquiry is not, as the dissent suggests, the adoption of a " 'fraudulent concealment' exception." *Infra* ¶ 126. It is simply a recognition of the fact that an evaluation of the father's knowledge of the mother's intentions must consider evidence of what the mother said about those intentions.

¶ 64 Our approach preserves reasonable meaning for the knowledge inquiry and for the proviso cited by the dissent—that a mother's "fraudulent representation is not a defense to strict compliance with the requirements of this chapter." UTAH CODE § 78B–6–106(2) (Section 106). Unlike the dissent,

---

qualifying circumstance would be unlikely to sue, or at least unlikely to press his case on appeal to a stage that would generate a published opinion.

23. The dissent chides us for "overrul[ing] our prior precedent" without giving reasons for doing so. *Infra* ¶ 115. But our decision today is not to overrule *O'Dea* (whose holding and essential standards are left intact), but simply to clarify its latent ambiguities. Such a decision is entirely consistent with the principle of *stare*

*decisis*, which recognizes that "people should know what their legal rights are as defined by judicial precedent, and having conducted their affairs in reliance on such rights, ought not to have them swept away by judicial fiat." *Austad v. Austad*, 2 Utah 2d 49, 269 P.2d 284, 290 (1954). That policy is not undermined but reinforced by a decision that clarifies ambiguities in past opinions without overruling their holdings.

we do not read the Act to *"forbid*[] consideration of 'any' fraudulent action, statement, or omission." *Infra* ¶ 134 (emphasis added). Rather, the Act merely states that fraud is not a *defense* to a father's failure to strictly comply with the requirements of the statute. UTAH CODE § 78B–6–106(2). Thus, a father who gained knowledge of a qualifying circumstance from another source (such as a friend, relative, revealed documents, etc.) could not defend his failure to comply with the statute by pointing to the birth mother's fraudulent representations to him. The ultimate question under the statute, in other words, is not fraudulent misconduct by the mother, but whether the father knew or could have known of a qualifying circumstance.

¶ 65 In addition, it should be noted that the fraud proviso has reference to the father's obligations in "compliance with the requirements of this chapter"—i.e., the requirements that the father protect his interests under Section 121(3) by filing a paternity proceeding and submitting an affidavit stating his capacity and willingness to provide for the child. *Id.* § 78B–6–121(3). Thus, Section 106 also clarifies that the father cannot forgo strict compliance with the Section 121(3) filing requirements because the mother defrauded him into thinking that such was not required.

¶ 66 That provision in no way suggests, however, that the mother's statements are irrelevant to the father's knowledge of qualifying circumstances. Such knowledge, after all, is not a "requirement[ ]" of the Adoption Act. It is simply a trigger for the imposition of those requirements. Thus, we read the "fraud" proviso in Section 106 to have no bearing on the knowledge inquiry under section 122(1)(c)(i)(A), preserving independent meaning for both the "fraud is not a defense" clause that the dissent relies on and for the

"knowledge trigger" provision requiring strict compliance. To do otherwise would render impossible the statutory evaluation of the father's knowledge, an approach that is clearly incompatible with the statutory text.[24]

**(c)**

¶ 67 Under the statutory standard as clarified above, we conclude that there is no basis in the record for a finding that Manzanares knew or reasonably could have known of the second, third, or fourth qualifying circumstance.

¶ 68 First, the parties have identified no evidence in the record to support a finding that Manzanares had knowledge, as opposed to belief. As the district court indicated, there was no evidence that Terry ever told Manzanares of her intention to have her baby in Utah or to give it up for adoption there.[25] And although Manzanares's Colorado petition expressed his "serious and founded concerns" about the possibility that Terry would "flee to Utah … to proceed with an adoption," those concerns arose from inferences he drew from the fact that Terry wanted to give the baby up for adoption somewhere, was raised in a Mormon family, and had relatives in Utah. This is belief at best, not knowledge. It is an inference that Manzanares drew from circumstantial "yellow flags," not an acceptance of a truth on good grounds.

¶ 69 The dissent makes much of the allegations in the Colorado proceedings, insisting that Manzanares's knowledge is "clear." *Infra* ¶ 154. But the dissent conflates belief with knowledge, and the Colorado allegations indicate only the former. Under Colorado's rules of civil procedure, a party may make an allegation in a legal pleading that is premised merely on "information and belief," not actual knowledge.[26] And that is precisely the

24. *State v. Morrison*, 2001 UT 73, ¶ 11, 31 P.3d 547 ("[A]ny interpretation which renders parts or words in a statute inoperative or superfluous is to be avoided." (interior quotation marks omitted)).

25. In fact, the district court acknowledged that Terry "never advised Mr. Manzanares that she intended to place the child for adoption with her brother and sister-in-law, and that she was in-

tending to do it in Utah," and that "neither the Byingtons [n]or Ms. Terry told [Manzanares] specifically what her adoption plans were."

26. *See* COLO R. CIV. P. 8(e)(1) ("Each averment of a pleading shall be simple, concise, and direct. When a pleader is without direct knowledge, allegations may be made upon information and belief."); *cf. Lotenfoe v. Pahk*, 747 So.2d 422, 424 (Fla.Dist.Ct.App. 1999) ("[A]n allegation made on

kind of allegation Manzanares was making in his Colorado filings when he detailed his "serious and founded concerns."

¶ 70 In fact, Manzanares filed the Colorado paternity action immediately on the heels of an email from Terry assuring him that she intended to return to Colorado to have the baby; *supra* ¶¶ 6–7. That email foreclosed any knowledge by Manzanares, leaving him only with the "concern[s]" he expressed on "information and belief." Manzanares's lack of knowledge was further confirmed by his actions upon Terry's return to Colorado one week after giving birth to the child. When he realized Terry was no longer pregnant, his reaction was to call hospitals in Colorado in an attempt to find his child. These are not the actions of a man who "knew" that Terry planned to give birth in Utah or consent to an adoption there.

 ¶ 71 Second, the record also clearly indicates that Manzanares "could not have known" of the second, third, or fourth qualifying circumstances "through the exercise of reasonable diligence." Utah Code § 78B–6–122(1)(c)(i)(A). Typically, this inquiry involves an exercise in the hypothetical—of what "reasonable diligence" the father could have undertaken and of what he "could have known" if he had been more diligent. *See O'Dea*, 2009 UT 46, ¶ 40, 217 P.3d 704. In this case, however, we know exactly what would have happened if the father had probed more deeply. Despite his repeated assertions of concern, the mother consistently rebuffed him and denied, under oath and otherwise, any intention to give birth or consent to adoption in Utah. Under the circumstances, it could hardly be clearer that Manzanares "could not have known" of Terry's concealed intentions. Any further diligence would have been pointless and thus unreasonable. The parties have not identified any further diligence that Manzanares might have undertaken, much less suggested a basis for concluding that such efforts would have given him knowledge of a qualifying circumstance.[27]

¶ 72 The dissent insists that the father's knowledge "at any point in time" should trigger strict compliance under Section 121(3), and asserts that Manzanares was required to file the paternity action and affidavit contemplated by that provision on the basis of the knowledge he had at the time of his Colorado paternity filing. *Infra* ¶¶ 140–43. This contention is premised on the dissent's reading of the statutory basis for an exception to the strict-compliance requirements of Section 121(3)—that "the unmarried biological father did not know, and through the exercise of reasonable diligence could not have known, before the time the mother executed a consent to adoption or relinquishment of the child for adoption, that a qualifying circumstance existed." Utah Code Ann. § 78B–6–122(1)(c)(i)(A). In the dissent's view, this provision triggers the strict compliance requirements of Section 121(3) anytime the father has any knowledge of a qualifying circumstance—however fleeting and whether or not such knowledge is defeated by subsequent events. Because the dissent deems

---

information and belief is not sufficient to prove the fact asserted."). *See generally* Charles Alan Wright, Arthur R. Miller, & Richard L. Marcus, Federal Practice & Procedure § 1224, at 299–301 (3d ed. 2004) ("Pleading on information and belief is a desirable and essential expedient when matters that are necessary to complete the statement of a claim are not within the knowledge of the plaintiff but he has sufficient data to justify interposing an allegation on the subject.").

27. Our analysis does not imply, as the dissent suggests, that a biological father must "comply with the statutory registration requirements only in cases where the birth mother told the father of her 'unequivocal' intent to give birth or consent to an adoption in Utah." *Infra* ¶ 121. Strict compliance is required in any case where the father "could have known" of a qualifying circumstance through "reasonable diligence." And knowledge that the father could have acquired could come from any reliable source, not just the mother. The problem here is not just that Terry failed to tell Manzanares of her intent; it is that in these circumstances Manzanares could not possibly have known of Terry's intentions regardless of any further diligence.

That does not forever foreclose the possibility of a finding that a father "could have known" of a qualifying circumstance upon further inquiry. If, for example, the mother openly tells her friends and family of her intentions but communicates nothing to the biological father, the court could find that he "could have known" of those intentions had he inquired of those friends and family, thereby triggering a requirement of strict compliance.

Manzanares to have known of Terry's intentions at the time he filed his Colorado paternity proceeding, it would require him to file the Section 121(3) paternity action and affidavit in the Utah courts *even if* such knowledge was subsequently defeated by Terry's denials.

¶ 73 We find this approach unpersuasive. In the first place, the factual premise of the argument is baseless, as there is no evidence that Manzanares had knowledge at any point in time—even upon the filing of the Colorado paternity action. And in any event, the dissent's reading of the statute is strained and would lead to absurd results.

¶ 74 The question highlighted by the dissent is whether a father's fleeting knowledge—for any brief period of time and even if defeated by subsequent information—triggers the Section 121(3) strict compliance requirements. The answer to that question is not apparent on the face of the statute. Its plain language simply provides for avoidance of strict compliance with Section 121(3) when the father lacked knowledge "before the time the mother executed a consent or relinquishment of the child." UTAH CODE § 78B–6–122(1)(c)(i)(A). That standard, in turn, raises the question whether the father must lack knowledge *at all times before* the execution of consent or relinquishment or just *immediately before* that takes place.

¶ 75 We read "before" in the statute in the latter sense. If the father knows of (or reasonably could have known of) a qualifying circumstance immediately before the mother executes a consent or relinquishment, he loses his parental rights absent strict compliance with the statute. If the father has failed to file the paternity papers and affidavit by the time of the consent or relinquishment, in other words, he has failed to effect strict compliance and his parental rights are forfeited. Fleeting knowledge at earlier stages, by contrast, does not necessarily trigger the requirement of strict compliance with Section 121(3). If such knowledge is defeated or overtaken by subsequent events, the father can properly say that he "did not know" or "could not have known" "before the time the mother executed" a consent or relinquishment.

¶ 76 That does not mean that an unmarried biological father can safely ignore the requirements of Section 121(3) strict compliance until the baby's due date approaches. There is always the chance the baby will be born prematurely, and strict statutory compliance may take some time. Thus, to be on the safe side, a father who wants to be sure to protect his rights should do so well before, and not just immediately before, the anticipated consent or relinquishment.

¶ 77 Despite the dissent's protestations to the contrary, the statutory language does not foreclose this approach. Nowhere does the statute use the language that the dissent adopts in paraphrasing it—that strict compliance is required "if the father either knows or should have known of one of the specified circumstances *at any point during the time* after the conception and 'before' " the execution of a consent or relinquishment.[28] *Infra* ¶ 140. Instead, the statute simply says "be-

---

28. The Adoption Act uses the "at any point" formulation in a different provision—in section 78B–6–122(1)(a), in the definition of "qualifying circumstance." But that simply clarifies that a qualifying circumstance can take place "at any point during the time period beginning at the conception of the child and ending at the time the mother executed a consent to adoption or relinquishment of the child for adoption." UTAH CODE § 78B–6–122(1)(a). It also suggests that the omission of similar language from section 78B–6–122(1)(c) is deliberate and telling. *See also Sill v. Hart*, 2007 UT 45, ¶ 7, 162 P.3d 1099 ("We read the plain language of a statute as a whole and interpret its provisions in harmony with other provisions in the same statute and with other statutes under the same and related chapters.... Consequently, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole." (alterations omitted) (internal quotations marks omitted)); *see, e.g., State ex rel. Z.C.*, 2007 UT 54, ¶¶ 8–10, 165 P.3d 1206 (concluding that, when read in the context of Utah's child sex abuse statute as a whole, children are both "person[s] under the age of 14" and persons capable of committing child sex abuse); The absence of the "at any point" qualifier in Section 122(1)(c) is an additional reason to construe the language of that provision to refer to the period *immediately* before the execution of consent or relinquishment. *See Carrier v. Salt Lake Cnty.*, 2004 UT 98, ¶ 30, 104 P.3d 1208 ("[w]e should give effect to any omission in the [statute] by presuming that the omission is purposeful.").

fore," giving rise to the above-noted ambiguity.

¶ 78 Although the statutory language does not resolve the ambiguity, the absurd consequences associated with the dissent's approach clearly do.[29] If the dissent's construction prevailed, unmarried fathers everywhere would be forced to file unnecessary paternity actions and affidavits to protect their rights in the speculative event that circumstances changed and there might be a need to do so. Consider a father who is told early in his girlfriend's pregnancy that she wants nothing to do with him and intends to give her child up for adoption in Utah. If that father completely reconciles with the mother of his child the next day, and she unequivocally recants any interest in an adoption (in Utah or elsewhere), it can certainly be said that the father no longer knows of a qualifying circumstance and thus should not be required to file a paternity proceeding and affidavit in Utah. Yet that is exactly what the dissent's approach would require.

¶ 79 We do not read the statute to require such pointless compliance with Section 121(3). Strict compliance is pointless and absurd if the father's knowledge of a qualifying circumstance is defeated by events that take place "before the time the mother" executes a consent or relinquishment. We accordingly read the statutory trigger for strict compliance—proof that the father knew or could have known—to be implicated only when the father's knowledge continues until just "before the time the mother executed" a consent or relinquishment.

¶ 80 This framework adequately resolves the "theoretical and practical dilemmas" posed by the dissent. *Infra* ¶ 144. If a birth mother "repeatedly vacillates regarding her intention to give their child up for adoption," *infra* ¶ 144, the father would be well-advised to comply strictly with the statute to be sure to protect his rights. But if the consent or relinquishment is executed at a time when he lacks knowledge of a qualifying circumstance, he can preserve his rights under Section 122(1)(c) without strictly complying with Section 121(3). That is because he "could not have known" of the qualifying circumstance immediately "before the time the mother executed a consent to adoption or relinquishment," Utah Code § 78B–6–122(1)(c)(i)(A).

¶ 81 For all of these reasons, we conclude that Manzanares could not have known, and did not know, of the second, third, or fourth qualifying circumstance.[30] Any factual findings the district court may have made to the contrary, even if made under a correct legal standard, were clearly erroneous, and we accordingly reverse.

### 3. The Qualifying Circumstance of Residence

¶ 82 The district court did not evaluate the one remaining qualifying circumstance—residence in Utah—but the Byingtons raise it as an alternative ground for affirming the district court's decision, so we address it here. This qualifying circumstance does not require any intent on the part of the mother. It simply asks a factual question: whether the father knew, or through the exercise of reasonable diligence could have known, that the mother resided ("on a permanent or temporary basis") in Utah.

29. *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 73, 210 P.3d 263 (preferring the statutory construction "that avoids absurd results" (internal quotation marks omitted)); *see also State v. Redd*, 1999 UT 108, ¶ 12, 992 P.2d 986 ("Where we are faced with two alternative readings, and we have no reliable sources that clearly fix the legislative purpose, we look to the consequences of those readings to determine the meaning to be given the statute.... In other words, we interpret a statute to avoid absurd consequences."); *Clover v. Snowbird Ski Resort*, 808 P.2d 1037, 1045 n. 39 (Utah 1991) ("When dealing with unclear statutes, this court renders interpretations that will avoid absurd consequences." (internal quotation marks omitted)).

30. Because we conclude that Manzanares could not have known of any of these three qualifying circumstances, remand for any further factual development would necessarily be an exercise in futility. We are not, therefore, "substituting [our] own judgment for that of the district court," *infra* ¶ 147, but simply holding that there is no basis in the record for a finding that Manzanares knew or could have known of a qualifying circumstance and thus have no reason to remand.

¶ 83 The adoptive parents cite *O'Dea* for the proposition that a mother who visits Utah shortly before giving birth to her child and gives birth to the baby in Utah is a temporary Utah resident under the statute. They further assert that Terry's brief visit to Utah to see her father (from her arrival in Utah on February 14, 2008, through her execution of consent to adoption at 8:45 a.m. on February 20) constitutes temporary residence under *O'Dea*. Because Manzanares was informed by e-mail of Terry's visit to Utah, the adoptive parents argue, Manzanares was aware of the qualifying circumstance of temporary residence in Utah.

¶ 84 We acknowledge that the birth mother in *O'Dea* was present in Utah for only a short period of time, and that we nonetheless concluded that she temporarily resided in Utah. Under the circumstances of this case, however, we cannot conclude that Terry *resided* in Utah, temporarily or otherwise. Terry informed Manzanares by e-mail only that she would *visit* Utah for a few days and that she would then return to Colorado for the remainder of her pregnancy. She was here only three days before giving birth to Baby B., and three days later she gave her consent to adoption. On this record, we see no basis for finding that Terry resided in Utah for purposes of the qualifying circumstances statute.

¶ 85 The facts regarding the length of the mother's stay in *O'Dea* are unclear. "At some point" between "early June" and June 15, 2006 (the day the child was born), the mother "traveled to Utah" to give birth to the child. *O'Dea*, 2009 UT 46, ¶ 6, 217 P.3d 704. The *O'Dea* majority made no definitive determination regarding the mother's length of stay in Utah, but concluded that the mother temporarily resided in Utah. The dissent characterized the mother's stay differently, maintaining that the record did not "reflect any facts" pertaining to the mother's length of stay in Utah "other than [a] telephone call, made on the very day [the mother] gave birth." *Id.* ¶ 49 (Durham, C.J., dissenting).

The dissent then hypothesized that "a one- to three-day hospital stay in Utah, for the sole purpose of giving birth and relinquishing an infant for adoption," could not satisfy the qualifying circumstance of residence. *Id.*

¶ 86 Equipped with these nebulous facts, "[w]e decline[d] to adopt a rule that establishes a minimum amount of time a mother must remain in Utah to become a temporary resident." *Id.* ¶ 36 (majority opinion). Although it was "unclear from the record exactly how long" the mother had been in Utah "around the time of the birth," we held that "the totality of the circumstances" in *O'Dea* "suggest[ed] that [the mother] temporarily resided in Utah." *Id.* Importantly, we reasoned that the unmarried biological father in *O'Dea* did not present "a compelling argument as to why [the mother's] presence in Utah did not constitute a temporary residence." *Id.* We therefore found that "the district court was not in error in determining the existence of a qualifying circumstance." *Id.*

¶ 87 As the *O'Dea* case demonstrates, temporary residence is a difficult term to define with precision. *See, e.g., In re McQuiston's Adoption*, 238 Pa. 304, 86 A. 205, 207 (1913). Under the circumstances of this case, however, we have little difficulty concluding that Terry did not "reside" in Utah. "Reside" means "[t]o dwell permanently or for a length of time; to have a settled abode for a time." *Knuteson v. Knuteson*, 619 P.2d 1387, 1389 (Utah 1980) (internal quotation marks omitted). The word connotes " 'a temporary or permanent dwelling place, abode, or habitation to which one intends to return as distinguished from a place of temporary sojourn or transient visit.' " [31]

¶ 88 In other contexts (divorce and insurance coverage), we have examined residence in light of such factors as voting, owning property, paying taxes, maintaining a mailing address, working or operating a business, and having children attend school in the fo-

---

**31.** *Keene v. Bonser*, 2005 UT App 37, ¶ 11, 107 P.3d 693 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1931 (1993)); *see also Mesa Dev. Co. v. Sandy City Corp.*, 948 P.2d 366, 369 (Utah Ct.App. 1997) ("[A] 'resident' is someone who dwells or resides in a place so as to be more than a mere inhabitant.").

rum.[32] Terry satisfies none of the above factors. At the time she gave birth to Baby B., Terry had long been a resident of Colorado. And as she stated in her e-mail to Manzanares, she was here merely to "visit" her sick father for a few days. We thus hold that Terry did not reside even temporarily in Utah, and accordingly that Manzanares did not know and could not have known of this qualifying circumstance.

¶ 89 The district court found that Terry intended not just to visit her sick father, but also to return in late March to give birth to the child here. Even if Terry's apparent intent to return were somehow relevant to the residency analysis, we still would find for Manzanares. First, Terry never returned for that purpose in late March (because the child was born on February 17). Under these facts, Manzanares could not have known that Terry ever *"resided "* (past tense) "on a permanent or temporary basis" in Utah. UTAH CODE § 78B–6–122(1)(a)(i) (emphasis added). Even if an individual plans to move to Utah on a permanent basis, surely she cannot be said to have temporarily resided here the moment she crosses state lines. Some threshold time period must first be met.

¶ 90 We cannot conclude that Terry resided here, even if only temporarily, when she was present in Utah for only six days before giving her consent to adoption—especially when her stated purpose for being here was to visit a sick relative.

¶ 91 Besides, Terry concealed from Manzanares any intention to return to Utah in March. Manzanares knew only that Terry planned to "visit" her "father in Feb[ruary] for a week[,] maybe a little longer." He accordingly did not know and could not have known that she resided in Utah.

### III

¶ 92 The district court in this case erroneously concluded that Manzanares "knew, or through the exercise of reasonable diligence should have known," of one or more qualifying circumstance. We therefore reverse the district court and remand the case for further findings regarding (1) whether Manzanares fully complied with Colorado's requirements to establish his parental rights in Baby B., and to preserve the right to notice of a Colorado adoption proceeding; and (2) whether Manzanares demonstrated a full commitment to his parental responsibilities.

Justice LEE authored the opinion of the Court, in which Justice DURHAM and Associate Chief Justice NEHRING joined.

Justice DURHAM filed a concurring opinion, in which Associate Chief Justice NEHRING joined.

Justice PARRISH filed a dissenting opinion, in which Chief Justice DURRANT joined.

Justice DURHAM, concurring:

¶ 93 I join fully in the majority opinion offered by Justice Lee; I write separately to highlight the difficult balance between competing rights struck by the statute and by our application of it in this case. It is true, as the dissent notes, that the result of this decision means hardship for Baby B. and her adoptive family. It is equally true that the opposite result would mean hardship for a father whose rights to form a relationship with his child and be part of her life (and arguably Baby B.'s right to know him and benefit from his care and concern) would be cut off notwithstanding the statutory protections afforded him. The legislature may well, as the dissent asserts, have identified maternal privacy and finality in adoptions as primary values. But antecedent to those goals are constitutional rights, inchoate or realized, that all biological parents have in associations with their children. In my view, the majority approach accepts the policy choices made by the legislature in drafting this statute and construes its language in a manner that honors those choices as expressed in that language. The majority and the dissent interpret the legal import of the

---

**32.** *See Bustamante v. Bustamante*, 645 P.2d 40, 41 (Utah 1982); *see also Travelers/Aetna Ins. Co. v. Wilson*, 2002 UT App 221, ¶ 14, 51 P.3d 1288 (adopting these and other factors in the insurance context).

facts differently, but both, I believe, seek to give full force to the legislature's intent.

Justice PARRISH, dissenting, in which Chief Justice DURRANT joins:

¶ 94 I agree with the majority that Ms. Terry's consent to the adoption was valid. But I do not agree with the majority's conclusion that Mr. Manzanares did not have knowledge of a qualifying circumstance. Ms. Terry's conduct in connection with this matter was fraudulent and outrageous. And while the majority's result is more palatable than the one dictated by the Utah Adoption Act, we cannot supplant the legislature's policy choices with our own sense of what is fair.

¶ 95 Although the result reached by the majority is defensible on basic fairness grounds, it is entirely at odds with the provisions of the Utah Adoption Act and the policy decisions duly enacted by the Utah Legislature. The majority's tortured analysis of the relevant statutory provisions creates a regime under which biological fathers can hide behind the majority's conception of a subjective actual knowledge requirement to escape their statutory obligations. The result will be a predictable lack of predictability and the certain disruption of future adoptive placements and even finalized adoptions. Because such a regime is the antithesis of what I am sure the Utah Legislature intended, I am compelled to dissent.

¶ 96 Not only is the majority's regime inconsistent with the general intent of the Utah Adoption Act, it writes out of the Act three very important and specific statutory provisions governing the obligations of biological fathers who wish to preserve their right to object to an adoption. First, the majority essentially writes out of the Act the inquiry notice provision that we construed in *O'Dea v. Olea*, replacing it with an actual knowledge requirement that will be impossible to satisfy in practice. Second, the majority limits the applicability of the fraud provision so drastically that they also effectively write it out of the Act. Third, the majority ignores the statutory provision suggesting that a father's compliance obligation arises when he becomes aware of a qualifying circumstance at any point in time, replacing it

with the novel notion that the only relevant time period for assessing the state of a biological father's actual knowledge is the undefined period immediately before a birth mother relinquishes her rights.

¶ 97 My concern with the majority's approach is not limited to what I believe to be its disregard of the legislative intent and its erroneous construction of specific statutory provisions. In addition to rejecting the legislative mandate, the majority has also chosen to reject the factual findings of the district court. Instead, it blithely suggests that the district court's factual findings are entitled to no deference because it did not adequately differentiate between what Mr. Manzanares actually knew and what he should have known. And rather than remanding the matter to the district court to articulate the basis for its findings, the majority decides to simply reverse, concluding without explanation that a remand would prove "fruitless." But such a remand would not prove fruitless for Baby B. and her adoptive parents because the evidence in the record unequivocally demonstrates that Mr. Manzanares knew or should have known that Ms. Terry was planning on giving birth in Utah and executing a consent to adoption under Utah law.

I. THE LEGISLATIVE INTENT OF THE UTAH ADOPTION ACT IS TO FACILITATE ADOPTIONS AND PROVIDE STABILITY AND PERMANENCE IN ADOPTIVE PLACEMENTS

¶ 98 When construing statutes, "our primary goal is to evince the true intent and purpose of the Legislature." *State v. Martinez*, 2002 UT 80, ¶ 8, 52 P.3d 1276 (internal quotation marks omitted). The best evidence of that intent is generally the language of the operative statutory provisions. *See id.* In the case of the Utah Adoption Act, however, the Legislature gave us additional guidance by including in the Act a detailed section declaring its findings and legislative intent. UTAH CODE § 78B–6–102. That statement of intent, together with the operative statutory provisions, must guide our construction of the Act. And when the specific statutory provisions are ambiguous,

we must resolve any ambiguities in a manner that is consistent with the stated legislative findings and purpose. *See T-Mobile USA, Inc. v. Utah State Tax Comm'n,* 2011 UT 28, ¶ 21, 254 P.3d 752.

¶ 99 The statement of legislative intent leaves no doubt that the Legislature enacted the Utah Adoption Act to encourage adoption, to favor adoptive parents, and to ensure finality and permanence in adoptive placements. The statement begins with the proposition that "the state has a compelling interest in providing stable and permanent homes for adoptive children in a prompt manner" and "in preventing the disruption of adoptive placements." UTAH CODE § 78B–6–102(5)(a). And it recognizes that "adoptive parents have a constitutionally protected liberty and privacy interest in retaining custody of an adopted child." *Id.* § 78B–6–102(5)(d).

¶ 100 There is also no room for doubt about the Legislature's view regarding the relative rights of unmarried mothers and biological fathers. With respect to the rights of unmarried mothers, the Legislature found that "an unmarried mother, faced with the responsibility of making crucial decisions about the future of a newborn child, is entitled to privacy, and has the right to make timely and appropriate decisions regarding her future and the future of the child, and is entitled to assurance regarding the permanence of an adoptive placement." *Id.* § 78B–6–102(5)(b). As a result, the Legislature recognized that "an unmarried mother has a right of privacy with regard to her pregnancy and adoption plan, and therefore has no legal obligation to disclose the identity of an unmarried biological father prior to or during an adoption proceeding, and has no obligation to volunteer information to the court with respect to the father." *Id.* § 78B–6–102(7).

¶ 101 In contrast, the Legislature made it clear that unmarried, biological fathers who fail to strictly comply with the provisions of the Adoption Act are not entitled to any parental rights in a child placed for adoption. Specifically, the Legislature found that an unmarried biological father has only an "inchoate interest" in a child placed for adoption

and that "his biological parental interest may be lost entirely … by his failure to strictly comply with the available legal steps to substantiate it." *Id.* § 78B–6–102(5)(e), (6)(b). Indeed, the Legislature expressly stated its finding that "the interests of the state, the mother, the child, and the adoptive parents … outweigh the interest of an unmarried biological father who does not timely grasp the opportunity to establish" his rights. *Id.* § 78B–6–102(6)(c).

¶ 102 Finally, the Legislature recognized that adoption proceedings are often complicated by the failure of the biological mother to honestly communicate regarding her intentions and concluded that there is "no practical way to remove all risk of fraud or misrepresentation" in such proceedings. *Id.* § 78B–6–102(6)(d). In light of this recognition, the Legislature declared that "[a]n unmarried biological father is presumed to know that the child may be adopted without his consent unless he strictly complies with the provisions of [the Act]." *Id.* § 78B–6–102(6)(f). And the Legislature expressly decided to place the risk of fraud and misrepresentation on biological fathers. It declared:

> The Legislature finds no practical way to remove all risk of fraud or misrepresentation in adoption proceedings, and has provided a method for absolute protection of an unmarried biological father's rights by compliance with the provisions of this chapter. In balancing the rights and interests of the state, and of all parties affected by fraud, specifically the child, the adoptive parents, and the unmarried biological father, the Legislature has determined that the unmarried biological father is in the best position to prevent or ameliorate the effects of fraud and that, therefore, the burden of fraud shall be borne by him.

*Id.* § 78B–6–102(6)(d).

¶ 103 With this general legislative intent in mind, I now turn to the specific statutory provisions that the Legislature enacted to effectuate its intent. I believe that those provisions are clear and leave no room for the tortured construction adopted by the majority. But even if the specific statutory provisions were ambiguous, it is our duty to

construe ambiguous provisions in a manner that is consistent with the Legislature's stated findings and intent. In my view, the majority has construed three of the provisions in a manner that is entirely inconsistent with that intent.

## II. THE MAJORITY'S INTERPRETATION OF THE ADOPTION ACT DISREGARDS THE STATE'S INTEREST IN THE STABILITY AND PERMANENCE OF ADOPTIVE PLACEMENTS

¶ 104 To effectuate its policy choice of favoring adoption and adoptive placements, the Legislature provided that a biological father is not entitled to notice of an adoption proceeding or an opportunity to object to a proposed adoption unless he has filed a paternity action in Utah and registered with the Utah State Office of Vital Statistics prior to the time the birth mother executes her consent to the adoption. UTAH CODE § 78B-6-110(2)(b). This obligation is imposed on any birth father who "knew, or through the exercise of reasonable diligence should have known, ... that a qualifying circumstance existed." *Id.* § 78B-6-122(1)(c)(ii)(A). Qualifying circumstances include that the mother intended to give birth in Utah or intended to place the child for adoption in Utah. *See id.* § 78B-6-122(1)(a).

¶ 105 This court has previously held that a biological father is required to comply with the requirements of the Utah Adoption Act whenever he has knowledge of or is on inquiry notice as to the existence of a qualifying circumstance. *O'Dea v. Olea*, 2009 UT 46, ¶¶ 37–46, 217 P.3d 704. The operative question is therefore whether Mr. Manzanares "knew or should have known" that Ms. Terry intended to give birth in Utah or to put their child up for adoption in Utah. *See id.*, UTAH CODE § 78B-6-122(1)(c)(ii)(A).

¶ 106 In evaluating what Mr. Manzanares "could have known," [1] the majority espouses a position that will allow biological fathers to disrupt adoptive placements and finalized adoptions, even in cases where such fathers were aware that the birth mother was considering a Utah adoption before she relinquished her rights in the child. The majority accomplishes this by distinguishing knowledge from belief and holding that a father is not required to comply with the Act unless he has received "unequivocal notification" from the birth mother of her intent to give birth or consent to an adoption in Utah. But, as the Legislature has explicitly recognized and as this case demonstrates, birth mothers are often unsure as to their adoptive plans and, in any event, are not required to share their future plans with biological fathers. Because it will be practically impossible to establish that a biological father had absolute knowledge of a birth mother's intent at the point in time immediately before she executes her consent to the adoption, the standard adopted by the majority will rarely, if ever, be satisfied in practice. Such a result is fundamentally inconsistent with the legislative intent of ensuring finality, stability, and permanence in adoptive placements. In addition, it flies in the face of the statutory framework that places the burden of fraud and strict statutory compliance on the father.

### A. The Statutory Language Calls for Application of an Inquiry Notice Standard

¶ 107 The Legislature has specified that a father must strictly comply with the Utah Adoption Act if he "knew, or through the exercise of reasonable diligence should have

---

**1.** The majority claims that the "should have known" formulation is incorrect. *Supra* ¶ 51 n. 15. The majority focuses on what the father "could have known," *supra* ¶ 55, and claims that its "'could' formulation ... is correct as it is the language employed in the operative section." *Supra* ¶ 51 n. 15. But the phrase "could have known" is not present in the Adoption Act. *See* UTAH CODE 78B-6-122. The statute requires us to determine whether the father had actual or constructive knowledge of a qualifying circumstance, and the statute provides two possible options. The father either "knew[] or ... should have known" or he "did not know[] and ... could not have known" of a qualifying circumstance. *Compare id.* § 78B-6-122(1)(c)(ii)(A) *with id.* § 78B-6-122(1)(c)(i)(A). Therefore, it is not correct to speculate—as the majority does—on what the father "*could have known.*" *See, e.g., supra* ¶ 55. Rather, as we held in *O'Dea*, the operative question is whether the father knew or should have known of a qualifying circumstance. 2009 UT 46, ¶ 37–46, 217 P.3d 704.

known" of a qualifying circumstance. Utah Code § 78B–6–122(1)(c)(ii)(A). In *O'Dea*, we explicitly held that this language signifies an objective inquiry notice standard.[2] 2009 UT 46, ¶ 39, 217 P.3d 704. Determination of a birth mother's future intent and a biological father's knowledge of that future intent requires inquiry into the biological parents' subjective states of mind, which are often difficult, if not impossible, to establish. The objective inquiry notice standard is therefore necessary and consistent with the Legislature's intent of promoting "finality," "permanence and stability in adoptive placements" for the birth mother, adoptive parents, and the child. *See* Utah Code § 78B–6–102(5)(a)–(d), (6)(c); *O'Dea*, 2009 UT 46, ¶ 41, 217 P.3d 704.

¶ 108 Legislatures often adopt inquiry notice standards in the statute of limitation context to encourage plaintiffs to be vigilant in protecting their rights and to ensure finality for prospective defendants. *See United States v. Marion*, 404 U.S. 307, 322 n. 14, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) (noting that the policy underlying statutes of limitation is "to encourage promptness in the bringing of actions," "promote justice by preventing surprises through the revival of claims that have been allowed to slumber" and that statutes of limitation "are primarily designed to assure fairness to defendants ... when a plaintiff has slept on his rights" (internal quotation marks and citations omitted)). Ultimately, "such statutes represent a legislative judgment about the balance of equities in a situation involving the tardy assertion of otherwise valid rights." *Id.* "The theory is that ... the right to be free of stale claims ... prevail[s] over the right to prosecute them."

*Id.* (internal quotation marks omitted). This prevents plaintiffs from later claiming willful ignorance where they decided to "wait-and-see" what would happen with a claim.

¶ 109 The Utah Adoption Act's inquiry notice standard addresses similar concerns. By requiring that a father strictly comply with the Adoption Act "at the moment he [has] obtain[ed] notice that a qualifying circumstance exist[s]," *O'Dea*, 2009 UT 46, ¶ 39, 217 P.3d 704, the inquiry notice standard ensures "finality" as well as "permanence and stability in adoptive placements" for the birth mother, adoptive parents, and the child. More importantly, the inquiry notice standard prevents fathers from later claiming that they lacked actual knowledge as to the birth mother's future intent in cases where they either believed or were on notice of facts suggesting that the mother intended to give birth in Utah or place the child for adoption under Utah law.

¶ 110 In contrast, the majority's approach gives biological fathers license to be complacent in their rights and then later upset adoptive placements or even final adoptions.[3] In this case, Baby B. has been living with her adoptive parents for nearly four years and she does not know Mr. Manzanares. But the majority allows Mr. Manzanares to upset Baby B.'s adoptive placement even though he was indisputably aware that Ms. Terry was considering a Utah adoption but failed to comply with the relatively simple procedures required to perfect his rights. In my view, this approach is wholly inconsistent with the Legislature's intent of ensuring finality, sta-

---

2. Other courts considering similar language have reached this same conclusion. *See, e.g., Sudo Props., Inc. v. Terrebonne Parish Consol. Gov't*, 503 F.3d 371, 376 (5th Cir.2007) (noting that the phrase "knew, or in the exercise of reasonable diligence, should have known .... is generally referred to as 'inquiry notice,' and it applies when a reasonable [person] of ordinary intelligence would have discovered the information and recognized it as a [cause of action]" (internal quotation marks omitted)).

3. An adoption under the Act generally may not be finalized until the child has lived in the home of the adoptive parents for six months, Utah Code Ann. § 78B–6–135(7)(a) (2008), during which

time any interested person may petition the court to determine the rights and interest of any person who may claim an interest in the child. *Id.* § 78B–6–109. And under the majority's approach, even a final adoption could be contested by a biological father who claimed he did not have actual notice as to the birth mother's future intentions up to one year from the day on which the final decree of adoption is entered. *Id.* § 78B–6–133(7)(b). Thus, under the majority's ruling, adoptive placements will be at risk for a minimum of 18 months. This is plainly at odds with the legislative intent of the Adoption Act. *See id.* § 78B–6–102.

bility, and permanence in adoptive placements.

### B. The Majority Overrules Our Controlling Precedent in O'Dea v. Olea Without Adequate Justification

¶ 111 The holding that the majority reaches today is not only inconsistent with the statutory language and legislative intent, it is patently inconsistent with our recent opinion in *O'Dea*, 2009 UT 46, 217 P.3d 704. While the majority attempts to characterize its standard as generally consistent with *O'Dea*, it is not. In fact, the majority's holding amounts to a wholesale rejection of *O'Dea*'s reasoning, analysis, and holding. And the majority overrules *O'Dea* without adequate justification.

1. The Majority's Opinion Is Wholly Inconsistent with *O'Dea*, Which Recognized the Adoption Act's Inquiry Notice Standard

¶ 112 The foundation of our opinion and holding in *O'Dea* was the recognition of an objective inquiry notice standard as it relates to a biological father's notice of a qualifying circumstance. Indeed, we spent no fewer than nine paragraphs explaining the wisdom of such a standard. *O'Dea*, 2009 UT 46, ¶¶ 37–45, 217 P.3d 704. The majority insists that its "decision here is consistent with *O'Dea*," and tries to couch any inconsistencies as only "arguably incompatible" with *O'Dea*. *Supra* ¶¶ 59–60. But today's decision could not be more incompatible with the precedent this court set in *O'Dea* only two years ago.

¶ 113 In *O'Dea*, we acknowledged that the Legislature selected an objective inquiry notice standard in adoption cases. 2009 UT 46, ¶ 39, 217 P.3d 704. We held that the father's knowledge of a qualifying circumstance "must rise to an objective level of inquiry notice," which we defined as whatever is "sufficient to alert him to conduct further inquiry" and "whatever is notice enough to excite attention and put the party on his guard and call for inquiry." *Id.* ¶¶ 39–40 (alteration omitted) (internal quotation marks omitted). We further held that "[w]hether

the father actually undertakes further inquiry is *irrelevant* to his obligation to comply strictly with [the statute,] ... which arises at the moment he obtains notice that a qualifying circumstance existed." [4] *Id.* ¶ 39 (emphasis added).

¶ 114 *O'Dea* explicitly rejected a subjective definition of notice because "[t]he plain words of the statute do not require that an unmarried biological father have ... absolute certainty ... free from any subjective doubt that a qualifying circumstance has existed or presently exists." *Id.* Instead, this court observed that "the statute requires only that a father have knowledge or have received sufficient notice that a qualifying circumstance existed sufficient to alert him to conduct further inquiry." *Id.* We also warned in *O'Dea* that "[t]o place a subjective standard on whether an unmarried biological father knew a qualifying circumstance existed and to inquire into the expectant mother's choices would in most cases unduly hamper the [l]egislature's clear policy objectives," *id.* ¶ 44, which the statute identified as " 'providing stable and permanent homes for adoptive children in a prompt manner' and preserving a birth mother's entitlement 'to privacy ... [and] to make timely and appropriate decisions regarding her future and the future of the child.'" *Id.* ¶ 41 (alterations in original) (quoting UTAH CODE ANN. § 78–30–4.12(2)(b) (Supp.2006)). Today's majority has effectively adopted a subjective actual notice standard, even though *O'Dea* rejected that standard as inconsistent with language and intent of the Adoption Act. *Id.* ¶¶ 39, 44. In so doing, the majority has supplanted its own policy objectives for those adopted by the Legislature.

2. The Majority Has Not Adequately Explained Its Reasons for Overruling *O'Dea*

¶ 115 Because the majority overrules our prior precedent, "it is incumbent on [the majority] to explain" its reasons for doing so. *State v. Menzies*, 889 P.2d 393, 399 (Utah 1994). Under the doctrine of stare decisis,

---

4. This standard mirrors the law applicable in the statute of limitation context. There, this court has held that "all that is required to trigger the statute of limitation is sufficient information to

put plaintiffs on notice to make further inquiry if they harbor doubts or questions." *Macris v. Sculptured Software, Inc.*, 2001 UT 43, ¶ 18, 24 P.3d 984.

our prior decisions constitute controlling precedent to which we are bound. *See id.* at 398–99. Stare decisis "is crucial to the predictability of the law and the fairness of adjudication." *Id.* at 399 (internal quotation marks omitted). The decision to overrule our prior decisions must be supported by a weighty justification and we will only overrule our prior decisions if we are "clearly convinced that the rule was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent." *Id.* (internal quotation marks omitted). We have also stated that "prior precedents should not be overruled lightly," *State v. Hansen,* 734 P.2d 421, 427 (Utah 1986), and that a party urging us to do so bears a "substantial burden of persuasion." *Menzies,* 889 P.2d at 398. In this case, the parties have not even requested that we overrule *O'Dea.* Instead, the majority has sua sponte overruled *O'Dea* without any justification.

*C. The Subjective Actual Notice Standard Adopted by the Majority Will be Impossible to Satisfy in Practice*

¶ 116 Actual notice is "[n]otice given directly to, or received personally by, a party." BLACK'S LAW DICTIONARY 1090 (8th ed. 2004). By contrast, inquiry notice is "[n]otice attributed to a person when the information would lead an ordinarily prudent person to investigate the matter further." *Id.* at 1091. The Adoption Act requires that fathers strictly comply with the Act when a father "knew, or through the exercise of reasonable diligence *should have known*" of a qualifying circumstance. UTAH CODE § 78B–6–122(1)(c)(ii)(A) (emphasis added). As we noted in *O'Dea,* the statute's plain language does not require "absolute certainty in the father's mind free from any subjective doubt that a qualifying circumstance has existed or presently exists." 2009 UT 46, ¶ 39, 217 P.3d 704.

¶ 117 The majority spends a great deal of its opinion arguing that "the Adoption Act expressly requires proof of [knowledge]." *Supra* ¶ 54. The majority explains that a father has knowledge of a mother's intent where the father has " 'unambiguous notification' by the mother of a qualifying circum-

stance," where there is "an 'unequivocally communicated' statement by the mother to the father," or where "the father is told by the mother that she intended to give birth in the state or consent to adoption there." *Supra* ¶¶ 56–57.

¶ 118 While actual knowledge would certainly meet the lower inquiry notice standard, actual knowledge is *not required* to meet inquiry notice. In this sense, knowledge exists on a continuum. On one end of the continuum is perfect knowledge through actual notice and on the opposite end is no knowledge at all. Constructive knowledge through inquiry notice falls somewhere between actual knowledge and no knowledge at all. The Utah Adoption Act does not "expressly require[ ] proof of [knowledge]," as the majority contends. *Supra* ¶ 54. Instead, under the Act, constructive knowledge exists where a father "knew, or through ... reasonable diligence should have known" of a qualifying circumstance. UTAH CODE § 78B–6–122(1)(c)(ii)(A).

¶ 119 For the majority, knowledge is black and white: a father either has knowledge through unequivocal notice of the birth mother's intent or no knowledge at all. The majority would require a father's compliance with the statute only where he has unequivocal knowledge of a mother's intentions, for instance where he receives actual notice from the mother (or from a third party) that the birth mother intends to consent to an adoption in Utah or give birth in Utah. Without that "unequivocal communication," the majority would find that the father has no knowledge at all. But this is far too rigorous a standard, especially since the statute requires strict compliance when a father "knew, or ... *should have known*" of a qualifying circumstance. UTAH CODE § 78B–6–122(1)(c)(ii)(A) (emphasis added).

¶ 120 This is not a case where the biological father lacked knowledge of the birth mother's intent. Rather, it is an unfortunate case where he either received erroneous legal advice or made a poor tactical decision. But the Act does not excuse a father from strict compliance because he chose to follow an erroneous legal strategy. And the fact remains that even though Mr. Manzanares

did not receive an "unequivocal communication" indicating Ms. Terry's intent, he had knowledge of sufficient facts to prompt him to file a paternity action in a Colorado court. Those same facts, coupled with his knowledge that the child would be unavailable for adoption in Colorado and that Ms. Terry had significant ties to Utah, provided sufficient knowledge to trigger his statutory obligations.

¶ 121 The majority pays lip service to the statute's "should have known" language by engaging in what it characterizes as "an exercise in the hypothetical" and then concluding that any reasonable diligence on behalf of Mr. Manzanares would have been futile because Ms. Terry would have undoubtedly lied regarding her true intentions. *Supra* ¶ 71. Thus, the majority would require that a biological father comply with the statutory registration requirement only in cases where the birth mother told the father of her "unequivocal" intent to give birth or consent to an adoption in Utah. But in cases where a birth mother has failed to give a biological father actual notice of her intent, the hypothetical exercise suggested by the majority will *always* result in a finding that the mother would not have been likely to share her intentions. Otherwise, she would have actually done so. In effect then, the majority's approach writes the "should have known" language out of the Act.

¶ 122 The majority suggests that its actual notice standard is not impossible to meet because "cases heard by this court confirm that the mother often will communicate her intentions to the father." *Supra* ¶ 58. But it is telling that *none* of the cases cited by the

majority would meet its "unequivocal communication" standard when the mother's intentions are at issue. Rather, these cases involve communications that are anything but unequivocal and, in most instances, blatantly false. They include cases where the birth mother informed the biological father that she intended to keep the child or of her intent to have an abortion. None of the cases involve a situation where the birth mother informed the biological father of her unequivocal and unwavering intention to place their child for adoption in Utah.[5] As such, they actually demonstrate the practical problem with the majority's rejection of the inquiry notice standard.

D. *The Majority Construes the Act as Requiring Actual Knowledge of a Birth Mother's Future Intent Even Though the Act Contains No Provision Requiring Notice to the Father*

¶ 123 Had the Legislature intended to impose an actual knowledge standard before requiring that biological fathers comply with the Act, it easily could have done so. And it could have done so in a manner that would have furthered, rather than destroyed, its intent of creating stability and permanence in adoptive placements. By imposing an actual knowledge standard in the context of a statutory scheme that does not contemplate notification to biological fathers, the majority instead undermines the legislative interest in permanence and finality.

¶ 124 Legislatures of several other states have made the policy choice that a child may not be placed for adoption unless the child's

5. *See O'Dea*, 2009 UT 46, ¶¶ 42–45, 217 P.3d 704 (holding that the mother's statement, "I am in Utah," placed the father on inquiry notice that the mother resided in Utah, but not deciding whether her statements indicated an intent to give birth or consent to an adoption in Utah); *J.S. v. P.K. (In re I.K.)*, 2009 UT 70, ¶¶ 2–3, 220 P.3d 464 (noting that the birth mother only informed the father "that she was pregnant and intended *to have an abortion*" and later "*without informing the Natural Father*, the Birth Mother consented to adoption and relinquished the baby" (emphases added)); *Osborne v. Adoption Ctr. of Choice*, 2003 UT 15, ¶¶ 3–4, 70 P.3d 58 (noting that the birth mother informed the father twice that "she had decided *not* to place the

child for adoption in Utah" (emphasis added)); *Swayne v. L.D.S. Soc. Servs.*, 795 P.2d 637, 639 (Utah 1990) (noting that the birth mother informed the father that *"her parents* wanted her to relinquish the child for adoption" but *not that she* intended to place the child for adoption (emphasis added)); *In re Adoption of Baby Boy Doe*, 717 P.2d 686, 687 (Utah 1986) (noting only that the mother and father spoke "on the phone regularly" before the mother untimely placed the child for adoption *without telling the father of her intention to do so* ); *Sanchez v. L.D.S. Soc. Servs.*, 680 P.2d 753, 754 (Utah 1984) (noting that the birth mother informed the father only that "she *might* give the baby up for adoption" (emphasis added)).

biological father has received actual notice of the child's adoptive placement or, in some states, has consented to the adoption.[6] But those state legislatures have included statutory provisions governing notice or consent requirements, thereby creating a safe harbor for birth mothers, prospective adoptive parents and adoptive children. Such notification provisions are designed to prevent those fathers who have failed to diligently protect their rights from later upsetting adoptive placements by claiming that they did not have absolute knowledge of the birth mother's intent to place their child for adoption.

¶ 125 Had the Utah Legislature intended to require that a biological father have actual and absolute knowledge of a birth mother's intent to place her child for adoption in Utah before requiring his compliance with the statutory requirements for protecting his paternal rights, it is odd that the Legislature did not include any provisions regarding the giving of such notice. And it is particularly odd because the model Uniform Adoption Act requires that biological fathers be given notice of any adoption proceedings. Unif. Adoption Act § § 3–401(a)(3), 3–404 (1994). Thus, had the Utah Legislature wanted to insist on actual knowledge before a biological father would lose his right to object to an adoption, it could have simply adopted the Uniform Act. But it did not; and I suspect that the reason is because it rejected the actual knowledge requirement of the Uniform Act in favor of a system of inquiry notice—a system that the majority today writes out of the Adoption Act.

## III. THE MAJORITY WRITES THE FRAUD PROVISION OUT OF THE ACT

¶ 126 Not only does the majority emasculate the Adoption Act's provision governing inquiry notice, it similarly emasculates the Act's fraud provision. The majority focuses on Ms. Terry's acts of deception and suggests that they are somehow relevant in determining whether Mr. Manzanares had knowledge of her plan to place their child for adoption in Utah or whether Mr. Manzanares could have learned of Ms. Terry's plan through the exercise of reasonable diligence. See supra ¶¶ 63–64. In effect, the majority creates a fraudulent concealment exception, excusing a father's failure to strictly comply with the Adoption Act where a mother has falsely represented her intent to place their child for adoption in Utah. And the majority would also allow a father's "reasonable diligence" to excuse him from strict compliance with the Act. But neither of these exceptions is found in the statutory language.

### A. The Act Explicitly Forbids Any Consideration of Ms. Terry's Deceptive or Fraudulent Conduct

¶ 127 The majority allows a mother's fraudulent statements to negate what a father knew, or through the exercise of reasonable diligence should have known. In effect, the majority excuses a father's failure to strictly comply with the Adoption Act where a mother has falsely mollified his concerns regarding the existence of a qualifying circumstance.

---

**6.** *See, e.g.,* Cal. Fam Code § 7666(a) (West 2011) ("[N]otice of the proceeding shall be given to every person identified as the natural father or a possible natural father . . . at least 10 days before the date of the proceeding. . . . Proof of giving the notice shall be filed with the court before the petition is heard."); Del. Code Ann. tit. 13, §§ 1106, 1107A(c)–(d), (f) (2011) ("In the case of [adoption proceedings] consent shall be required from . . . [t]he father and any presumed father of the child" and "[i]f, at any time in a proceeding for termination of parental rights, the Court finds that an unknown father of the child may not have received notice, the Court shall determine whether he can be identified . . . . [and] shall require notice to be served upon him," including three consecutive weeks of notice by publication.); D.C. Code § 16–304(a), (b)(2)(A) (2011) ("A petition for adoption may not be granted by the court unless there is filed with the petition a written statement of consent . . . from both parents. . . ."); Nev. Rev. Stat. § 127.040(1)(a) (2010) ("[W]ritten consent to the specific adoption proposed by the petition or for relinquishment to an agency authorized to accept relinquishments acknowledged by the person or persons consenting, is required from . . . [b]oth parents if both are living. . . ."); Vt. Stat. Ann. tit. 15A, § 2–401(a)(2) (2011) ("[A] petition to adopt the minor may be granted only if consent to the adoption has been executed by . . . the biological father identified by the mother or as otherwise known to the court. . . .").

¶ 128 The majority's desire to implement this exception makes some sense given that this court has adopted a similar "fraudulent concealment" exception in the statute of limitation context. *See Berenda v. Langford,* 914 P.2d 45, 51 (Utah 1996). Under this exception, "when a plaintiff alleges that a defendant took affirmative steps to conceal the plaintiff's cause of action, . . . . the plaintiff can avoid the . . . discovery rule by making a prima facie showing of fraudulent concealment and then demonstrating that given the defendant's actions, a reasonable plaintiff would not have discovered the claim earlier." *Id.* In other words, even if the plaintiff's duty to file his complaint was triggered because he knew or reasonably should have known that a cause of action existed, that knowledge is negated where the defendant takes affirmative steps to fraudulently conceal the plaintiff's cause of action.

¶ 129 The majority advocates a similar approach in the adoption context. Even where a father knew or reasonably should have known that a mother was going to give birth or consent to an adoption in Utah, the majority holds that the father's obligation to preserve his rights is negated where the mother takes affirmative steps to conceal or fraudulently misrepresent her true intentions.[7] But the Legislature has ruled out a fraud exception in adoption cases by explicitly stating that the risk of fraud is best borne by the father and that a mother's misrepresentations in adoption proceedings are no excuse for a father's failure to strictly comply with the provisions of the Utah Adoption Act. UTAH CODE §§ 78B–6–102(6)(d), 106. This court cannot create a fraudulent concealment exception where the Legislature has expressly disavowed that approach.

¶ 130 The legislative intent to foreclose a fraudulent concealment exception is unmistakably expressed in multiple provisions of the Utah Adoption Act. For example, the Act provides that "[e]ach parent of a child conceived or born outside of marriage is responsible for his or her own actions and is not excused from strict compliance with the provisions of this chapter based upon any action, statement, or omission of the other parent or third parties." *Id.* § 78B–6–106(1). And the legislative intent section of the Act goes so far as to countenance fraud in connection with adoption proceedings:

> The Legislature finds no practical way to remove all risk of fraud or misrepresentation in adoption proceedings, and has provided a method for absolute protection of an unmarried biological father's rights by compliance with the provisions of this chapter. In balancing the rights and interests of the state, and of all parties affected by fraud, specifically the child, the adoptive parents, and the unmarried biological father, *the Legislature has determined that the unmarried biological father is in the best position to prevent or ameliorate the effects of fraud and that, therefore, the burden of fraud shall be borne by him.*

*Id.* § 78B–6–102(6)(d) (emphasis added). The Act goes on to provide that a putative father's only recourse for fraudulent misrepresentations made in connection with the adoption of his child is "to pursue civil or criminal penalties"; *a mother's "fraudulent*

---

7. Under the majority's analysis, whether the fraud provision would be applicable could depend upon the *source* of the information. The majority urges that "a father who gained knowledge of a qualifying circumstance from *another source* (such as a friend, relative, . . . etc.) could not defend his failure to comply with the statute by pointing to the birth mother's fraudulent representations to him." *Supra* ¶ 64 (emphasis added). The majority's position would forbid consideration of a birth mother's subsequent fraudulent statements where a third party initially alerts the father to a qualifying circumstance, but it would allow consideration of the mother's same fraudulent statements where she initially tells the father of a qualifying circumstance. Such an approach is inexplicable in light of the fact that the original source of any third party information regarding a birth mother's intentions must originate from the birth mother herself. Thus, the majority elevates hearsay to a more reliable level than the birth mother's own statement of her intent. But there is nothing in the Act to suggest that the Legislature intended to limit the fraud provision in this way. Indeed, the plain language declares that *"all risk of fraud or misrepresentation* in adoption proceedings . . . . shall be borne by [the father]," UTAH CODE ANN. § 78B–6–102(d) (emphasis added), and that a father is not excused from strict compliance with the Act "based upon *any action, statement or omission of the other parent or third parties,"* id. § 78B–6–106(1) (emphasis added).

*representation is not a defense to strict compliance with the requirements of this chapter." Id.* § 78B–6–106(2) (emphasis added).

¶ 131 The majority construes these fraud provisions in a manner that is simply inconsistent with the statutory language and that is at odds with the legislative intent that "the burden of fraud is best borne by the father." The majority holds that fraudulent statements made by the mother may be considered in determining whether a father had knowledge of a qualifying circumstance and limits the legislative prohibition on consideration of fraud to a very specific category of representations—fraudulent representations regarding the statutory requirements found in section 121(3) of "filing a paternity proceeding and submitting an affidavit stating his capacity and willingness to provide for the child." *Supra* ¶ 65.

¶ 132 In other words, the majority would apply the fraud provision only when the father goes to the mother for legal advice regarding the statutory requirements for protecting his paternal rights and the mother makes a fraudulent representation about those legal requirements. But the majority's interpretation is without support in the language of the Act. And it also renders the fraud provision essentially meaningless as it is difficult, if not impossible, to conceive of a scenario where a biological father would either seek or obtain legal advice from a birth mother regarding the statutory compliance obligations specified in section 121(3) of the Act.

¶ 133 The language enacted by the Legislature does not limit its applicability in any way. Rather, it provides that a parent is not excused from strict compliance with the requirements of the Act based on *any* fraud of the other parent or a third party. Specifically, the Act states:

Responsibility of each party for own actions—Fraud or misrepresentation.

(1) Each parent of a child conceived or born outside of marriage is responsible for his or her own actions and is not excused from strict compliance with the provisions of this chapter *based upon*

*any action, statement, or omission of the other parent or third parties.*

(2) Any person injured *by fraudulent representations or actions in connection with an adoption* is entitled to pursue civil or criminal penalties in accordance with existing law. *A fraudulent representation* is not a defense to strict compliance with the requirements of this chapter, and is not a basis for dismissal of a petition for adoption, vacation of an adoption decree, or an automatic grant of custody to the offended party. Custody determinations shall be based on the best interest of the child, in accordance with the provisions of Section 78B–6–33.

Utah Code § 78B–6–106 (emphases added).

¶ 134 Had the Legislature wished to limit the applicability of the fraud provision to representations made concerning the compliance requirements listed in section 121(3), it could have easily done so. It could have stated that a parent is not excused from strict compliance "based upon any action, statement, or omission of the other parent or third parties *with respect to the requirements of section 121*." But such limiting language is simply not present. Rather, the Act forbids consideration of "any" fraudulent action, statement or omission and provides that a parent is not excused from compliance with any of the "provisions" or "requirements" of the Act because of such fraud. *See id.* §§ 78B–6–106, –102(6)(d).

¶ 135 In practice, the majority's attempt to limit the fraudulent representation provision to fraudulent statements made regarding the requirements of section 121 will render the fraud provision meaningless. Experience demonstrates that mothers rarely, if ever, provide legal advice to fathers with regard to their compliance obligations under Utah law. Not a single case to come before this court involves such fraudulent advice. Rather, as demonstrated by the cases discussed above,[8] the type of fraud commonly present in adoption cases involves the birth mother's fraudulent statements, actions or omissions regarding her intent to place the child for adoption. Because I have no doubt that it was this type

8. *See supra* ¶ 122 n. 5.

of fraud that the Legislature intended to address in enacting the fraud section, I simply cannot countenance the antithetical construction espoused by the majority.

¶ 136 In summary, the "fraudulent concealment" exception created by the majority blatantly disregards the Legislature's policy choice to place the burden of fraud on unmarried biological fathers. The majority completely disregards this legislative mandate and excuses a father's strict compliance where a mother misrepresents her intentions, even when all of the facts available to the father suggest their blatant falsity. This conclusion directly conflicts with the Utah Adoption Act, which places the burden of fraud on unmarried biological fathers.

## IV. MR. MANZANARES'S OBLIGATION OF STRICT COMPLIANCE AROSE AT THE MOMENT THAT HE KNEW OR SHOULD HAVE KNOWN OF MS. TERRY'S INTENT TO PLACE THE CHILD FOR ADOPTION

¶ 137 The majority holds that where a mother vacillates between a decision to place a child for adoption and a decision to keep the child, the father's compliance obligation arises only if he had absolute knowledge of the mother's intent to place the child for adoption in Utah at the point in time "immediately before" the mother executes her consent. The majority reaches this conclusion after reasoning that it "is not apparent on the face of the statute" whether a father must "lack knowledge at all times before the execution of consent or relinquishment or just immediately before that takes place." *Supra* ¶ 74 (emphases omitted).

¶ 138 The statute presents two temporal questions: 1) when must the qualifying circumstance have existed? and 2) when must the father's knowledge be assessed? As to the first question, the answer is clear: the qualifying circumstance may have existed "at any time" between conception and relinquishment. In this case, it is undisputed that Ms. Terry intended to give birth in Utah, intended to execute a consent or relinquishment in Utah, and gave birth in Utah, and that all those circumstances existed during the period between conception and relinquishment.

As to the second question, the majority argues that it is only the state of the father's knowledge "immediately before" relinquishment that must be assessed in determining whether his obligation of strict compliance is triggered.

¶ 139 The majority's approach is at odds with the clear statutory language defining qualifying circumstances. The statutory definition of a qualifying circumstance is not limited to the period immediately prior to the time that the mother executes her consent to adoption. Rather, " 'qualifying circumstances' means that, *at any point during the time period beginning at the conception of the child and ending at the time the mother executed a consent to adoption or relinquishment of the child for adoption*," the child's mother intended to, among other things, give birth in Utah or place the child for adoption in Utah. UTAH CODE § 78B–6–122(1)(a) (emphasis added). The Act later states that consent of the father is required if he "did not know, and through the exercise of reasonable diligence could not have known, *before* the time the mother executed a consent to adoption or relinquishment of the child for adoption, that a qualifying circumstance existed." *Id.* § 78B–6–122(1)(c)(i)(A) (emphasis added).

¶ 140 I find nothing ambiguous about the statutory language. Under the plain statutory language, a qualifying circumstance exists if the father either knows or should have known of one of the specified circumstances *at any point during the time* after conception and "before the time the mother executed a consent to adoption or relinquishment of the child for adoption." *Id.* The Legislature's use of the phrase "at any point" in subsection (1)(a), in conjunction with its use of the phrase "during the time period beginning at the conception of the child and ending at the time the mother executed a consent to adoption or relinquishment of the child for adoption," compels the conclusion that a biological father must comply with the statutory requirements to preserve his inchoate rights whenever he has become aware of a qualifying circumstance at any point in time before the mother executes her relinquishment. Indeed, we reached this same

conclusion in *O'Dea* when we held that a father's "obligation to comply strictly with [the Adoption Act] ... arises *at the moment* he obtains notice that a qualifying circumstance existed." *O'Dea v. Olea*, 2009 UT 46, ¶ 39, 217 P.3d 704 (emphasis added).

¶ 141 The plain meaning of the term "before" also supports this interpretation. The ordinary meaning of the term "before" means prior in time. The majority reads the phrase "before" to mean "immediately before," but the phrase "immediately before" does not appear in the Act. It is also instructive that one of the qualifying circumstances is that the mother or child resided in the state. UTAH CODE § 78B–6–122(1)(a)(i). While I agree with the majority that Ms. Terry did not reside in Utah, the inclusion of that qualifying circumstance in the statutory list illustrates the unworkability of the majority's interpretation. Under a plain reading of the phrase "before," once a mother resides in Utah, even temporarily, a qualifying circumstance exists. And even if the birth mother later moves out of the state, the fact remains that a qualifying circumstance existed at some point after conception and before relinquishment and the father who had knowledge of that circumstance would be obligated to strictly comply with the statutory requirements.[9] Similarly, once a father has knowledge of a birth mother's intent to place her child for adoption in Utah, the fact that she later changes her mind does not mean that the father did not have knowledge of her intent at some point after conception and before relinquishment.

¶ 142 In my view, a father's obligation under the Act is clear: at the moment he obtains notice of a qualifying circumstance, he is required to comply with the Adoption Act by filing a paternity action in Utah. His duty to file a paternity action in Utah arises at the moment he knew or should have

known of a qualifying circumstance, and his opportunity to perfect his interest ends when a mother executes a consent to adoption or relinquishment in the state. And his duty to strictly comply does not evaporate because a birth mother later makes fraudulent misrepresentations regarding her intent or because her intentions vacillate.

¶ 143 The majority defends its interpretation by arguing that focusing on any period other than the time "immediately prior" to the execution of the mother's consent would lead to the "absurd" result of requiring that fathers file possibly unnecessary and pointless paternity petitions in Utah courts. *Supra* ¶ 79. But the filing of such petitions would put birth mothers, adoption agencies, and prospective adoptive parents on notice of the biological father's interest and would also secure his parental rights regardless of whether the birth mother later vacillated or changed her mind. This result is hardly absurd. Rather, it promotes the Legislature's policy objective of promoting "permanence and stability in adoptive placements" and finality for the birth mother, adoptive parents, and the child by providing biological fathers with a "method for absolute protection" of their rights. UTAH CODE §§ 78B–6–102(5)(a)–(d), (6)(c)–(d).

¶ 144 In contrast, the majority encourages biological fathers to take a wait-and-see approach by giving them license to claim that they lacked actual knowledge as to the mother's plans at the point in time just prior to the execution of her consent. The majority's position is rife with both theoretical and practical dilemmas. For example, what is the obligation of a biological father in a case where the birth mother repeatedly vacillates regarding her intention to give their child up for adoption and truthfully shares her intent with the father at varying points in time?

---

9. Indeed, this court followed this rule in *H.U.F. v. W.P.W.*, 2009 UT 10, 203 P.3d 943. In that case, we determined that "[a]lthough the Birth Mother stated a week later in an e-mail to the Putative Father that she had not moved to Utah, the Putative Father still had reason to believe she was in Utah because she had previously told him that she was there, her attorney told him that she was there, and the Birth Mother's statement that she had not 'moved' to Utah did not necessarily mean that she was not staying in Utah until the baby was born and placed for adoption." *Id.* ¶ 38. Based on this reasoning, we upheld the district court's finding that the father had reason to know that the Birth Mother was in Utah. *Id.* We reached this conclusion even though the father arguably did not have knowledge of a qualifying circumstance "immediately before" the mother consented to the adoption.

What is his obligation where the mother denies that she intends to place the child for adoption even when he is aware of facts that suggest otherwise? At what point in time does his obligation of strict compliance mature? And what about the case where the birth mother informs the biological father of her intent to place the child for adoption and maintains that intent throughout her pregnancy, only to change her mind the day before giving birth? Is the birth father in such a situation relieved of his obligation to comply with the statute because he learns of the mother's change of heart a day before the child is born? Similarly, what about the case where the birth mother is actively considering placing her child for adoption in Utah and shares that fact with the father, but does not definitively make up her mind until moments before signing the relinquishment? Finally, how long does a biological father have to conduct due diligence? And what if his due diligence leads to no additional information or proves inconclusive? The permutations are endless and demonstrate the unworkability of the majority's position.

## V. MR. MANZANARES KNEW OR SHOULD HAVE KNOWN THAT MS. TERRY PLANNED TO GIVE BIRTH IN UTAH OR PLACE BABY B. FOR ADOPTION UNDER UTAH LAW

### A. *The Majority Erroneously Disregards the Factual Findings of the District Court*

¶ 145 The district court made a factual finding that Mr. Manzanares "knew, or through the exercise of reasonable diligence should have known, that (i) Ms. Terry intended to give birth in Utah ... or (iii) Ms. Terry intended to execute a consent to adoption of the child in Utah." The district court based its finding on Mr. Manzanares's Colorado filings "and other evidence adduced at the evidentiary hearing." Relying on Mr. Manzanares's self-serving testimony that is flatly contradicted by the statements he made under oath in the Colorado lawsuit, the majority supplants the district court's factual finding with a contrary finding, concluding that Mr. Manzanares was unaware of Ms. Terry's intentions to give birth in Utah or to place

the child for adoption in Utah. In so doing, the majority disregards our well-established standard of review for factual findings.

¶ 146 It is well settled that "the issue of when a plaintiff knew or with reasonable diligence should have known of a cause of action is a question of fact for the [factfinder]." *Maughan v. SW Servicing, Inc.,* 758 F.2d 1381, 1387 (10th Cir.1985). We will not disturb a district court's findings of fact unless they are "clearly erroneous." *Glew v. Ohio Sav. Bank,* 2007 UT 56, ¶ 18, 181 P.3d 791; *accord Chen v. Stewart,* 2004 UT 82, ¶ 19, 100 P.3d 1177; *see also* UTAH R. CIV. P. 52(a) ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."). Findings of fact are not clearly erroneous unless they are so lacking in support as to be against the clear weight of the evidence. *Encon Utah, LLC v. Fluor Ames Kraemer, LLC,* 2009 UT 7, ¶ 11, 210 P.3d 263; *accord Chen,* 2004 UT 82, ¶ 19, 100 P.3d 1177. If, viewing the evidence in the light most favorable to the trial court's determination, a factual finding is based on sufficient evidence, the finding is not clearly erroneous. *See Save Our Schs. v. Bd. of Educ.,* 2005 UT 55, ¶ 9, 122 P.3d 611.

¶ 147 This standard prohibits an appellate court from independently reviewing the evidence and substituting its own judgment for that of the district court. *See 438 Main St. v. Easy Heat, Inc.,* 2004 UT 72, ¶ 75, 99 P.3d 801. Yet that is precisely what the majority does. The majority spends no less than five pages discussing standards of review to justify the fact that it simply supplants the district court's primary factual finding with a completely contrary finding and without seriously considering a remand on the factual issues. In so doing, the majority has impermissibly cast aside what is, in reality, a factual finding made by the district court and fully supported by the evidence.

¶ 148 In this case, the district court observed firsthand Mr. Manzanares's self-serving testimony that he did not "know" or "believe" that Ms. Terry intended to give birth in Utah or place the child for adoption

there. The court also witnessed the cross-examination of Mr. Manzanares, which revealed that he knew Ms. Terry was a member of the Church of Jesus Christ of Latter-day Saints (LDS Church), that she was from Utah, and that her family lived in Utah. He knew she intended to place the child for adoption with an LDS couple through LDS family services, and he knew she planned three trips to Utah during her pregnancy. The cross-examination also focused on the sworn statements Mr. Manzanares made in his paternity petition and revealed that he was aware that Ms. Terry intended to place the child for adoption even after the child became unavailable for adoption in Colorado. After evaluating all the testimony and observing the demeanor of the witnesses, the district court concluded that Mr. Manzanares knew or should have known of a qualifying circumstance. Thus, even if this case presents a mixed question, as the majority asserts, we must give deference to the district court's conclusion because the " 'judge has observed "facts," such as a witness's appearance and demeanor, relevant to the application of the law that cannot be adequately reflected in the record available to appellate courts.' " *See supra* ¶ 42 (quoting *State v. Pena,* 869 P.2d 932, 938–39 (Utah 1994)).

*B. The Evidence Compels the Singular Conclusion That Mr. Manzanares Knew or Should Have Known of a Qualifying Circumstance*

¶ 149 The evidence in this case supports only one conclusion. That conclusion is the one reached by the district court—that Mr. Manzanares knew or should have known of a qualifying circumstance. Mr. Manzanares's Colorado pleadings reveal that he knew Ms. Terry intended to "flee to Utah" to give birth and place the child for adoption. Or, at the very least, Mr. Manzanares should have known that was her intent. Mr. Manzanares maintained that knowledge until Ms. Terry consented to the adoption, and any deceptive conduct on her part did not excuse his failure to comply with the requirements of the Utah Adoption Act. If the facts in this case do not establish knowledge of a qualifying circumstance, then no conceivable set of facts ever will.

1. Mr. Manzanares's Pleadings in the Colorado Lawsuit Reveal That He Actually Knew of a Qualifying Circumstance

¶ 150 According to the majority, knowledge " 'applies to [1] any body of *known facts* or to [2] any body of ideas *inferred from such facts* or accepted as truths on good grounds.' " *Supra* ¶ 55 (emphases added) (quoting *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 590, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Even under the majority's own "knowledge" standard, Mr. Manzanares's pleadings in the Colorado lawsuit demonstrate that he knew or, at the very least, inferred Ms. Terry's intent from known facts.

¶ 151 Mr. Manzanares repeatedly represented in sworn statements to the Colorado court that Ms. Terry would give birth in Utah and/or "proceed with an adoption" in Utah. In his Colorado paternity petition, Mr. Manzanares stated that he was concerned that "although the unborn child will not be legally available for adoption [under Colorado law], [Ms. Terry] plans to surreptitiously make the child available for adoption immediately upon his or her birth." Mr. Manzanares added that he was genuinely concerned that Ms. Terry would "flee to Utah, where she has family, to proceed with an adoption."

¶ 152 Mr. Manzanares's knowledge was based on inferences derived from known facts. Indeed, his Colorado pleadings provided detailed support for his assertions regarding Ms. Terry's intent. He testified that his concerns were "serious and founded" because officials at Ms. Terry's church had advised her to make the child available for adoption to a married couple that belonged to the LDS Church, an agency affiliated with Ms. Terry's church had attempted to coerce Mr. Manzanares to consent to placement of his child for adoption, and Ms. Terry had "repeatedly asserted her intention to give the child up for adoption ... and continue[d] to pressure [him] to authorize an adoption." Mr. Manzanares also reasoned that Ms. Terry would flee to Utah to proceed with an adoption because she knew that the child would be unavailable for adoption under Col-

orado law. Given Mr. Manzanares's knowledge of these facts, he inferred the only reasonable conclusion—that Ms. Terry intended to give birth to the parties' child in Utah or consent to an adoption in Utah.

¶ 153 The majority claims that Mr. Manzanares's Colorado pleadings merely represent his "belief" of her future intentions, which arose "from inferences he drew from the fact[s]." *Supra* ¶ 68. But even under the majority's own definition of knowledge, a father's "inferences" based on known facts meet the required knowledge standard since knowledge " 'applies to . . . any body of ideas *inferred from [known] facts.*' " *Supra* ¶ 55 (emphasis added) (quoting *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786).

¶ 154 The majority insists that Mr. Manzanares's reasonable inferences are "belief at best, not knowledge." [10] *Supra* ¶ 68. But Mr. Manzanares's petition did not allege that he merely "believed" or "suspected" that Ms. Terry would go to Utah, his petition stated in unequivocal terms that "[Ms. Terry] is planning to give birth in Utah and place the parties' unborn child up for adoption." Mr. Manzanares also swore, under oath, that his petition's statements were "true and accurate to the best of [his] *knowledge.*" Based on his pleadings, it is clear that Mr. Manzanares knew that Ms. Terry intended to travel to Utah to give birth and place the child for adoption. [11] The majority cannot now claim that Mr. Manzanares did not *know* that Ms. Terry intended to give birth in Utah or place the child for adoption in Utah simply

because he was never given "unequivocal notification" of her intent.

**2. At the Very Least, Mr. Manzanares Should Have Known of a Qualifying Circumstance**

¶ 155 Even if Mr. Manzanares's statements in his Colorado petition are not reflective of what he subjectively knew, the facts available to him would, at the very least, lead a reasonable person to conclude that Ms. Terry was planning on fleeing to Utah to have the baby or place the child for adoption.

¶ 156 In *Harrison v. United States*, the Fifth Circuit Court of Appeals adopted an inquiry notice standard in construing a statute of limitation, concluding that "the statute of limitations does not begin to run until after the [plaintiff] discovers or in the exercise of reasonable diligence should discover his injury and its cause." 708 F.2d 1023, 1027 (5th Cir.1983) (internal quotation marks omitted). Under that standard, the court noted that a plaintiff "must have knowledge of facts that would lead a reasonable person . . . to conclude that there was a [cause of action]." *Id.* This is consistent with the standard we set forth in *O'Dea*, where we noted that "[a] duty to inquire further into the existence of a fact may occur when circumstances arise that should put a reasonable person on guard." 2009 UT 46, ¶ 40, 217 P.3d 704 (internal quotation marks omitted).

¶ 157 Even if Mr. Manzanares did not have absolute knowledge of Ms. Terry's intent to

---

**10.** The majority argues that "[k]nowledge and belief are distinct states of mind." *Supra* ¶ 54. While this may be true in the abstract, the cases that the majority cites for this proposition do not support its contention that Mr. Manzanares's Colorado petition relied on an unreasonable "belief" rather than his reasonably inferred "knowledge." The statutes at issue in the cases cited by the majority required *actual knowledge*, rather than inquiry notice. *See Iron Silver Mining Co. v. Reynolds*, 124 U.S. 374, 384, 8 S.Ct. 598, 31 L.Ed. 466 (1888) (noting that "[t]he statute speaks of acquiring a patent with a *knowledge* of the existence" of certain qualifying circumstances (emphasis added)); *Tracerlab, Inc. v. Indus. Nucleonics Corp.*, 313 F.2d 97, 102 (1st Cir.1963) (noting that "we cannot ignore the fact that the statute itself uses the unqualified word 'knowledge' in setting forth the prescribed state of a plaintiff's perception of the pertinent facts");

*Jameson v. Jameson*, 176 F.2d 58, 60 (D.C.Cir. 1949) (holding that an affiant's "belief" was not a sufficient fact to preclude summary judgment since the federal rules of civil procedure required that an affidavit must be made "on personal *knowledge*, [and] shall set forth such *facts* as would be admissible in evidence" (emphases added) (internal quotation marks omitted)). In fact, the majority cannot point to a single inquiry notice case that draws such a hard line between belief and knowledge. *See supra* ¶ 54 n. 16.

**11.** Courts often rely on pleadings to determine a party's constructive knowledge. *See, e.g., Salinger v. Projectavision, Inc.*, 972 F.Supp. 222, 229 (S.D.N.Y.1997) ("[T]he [inquiry notice] test is an objective one and dismissal is appropriate when the facts from which knowledge may be imputed are clear from the pleadings. . . .").

give birth in Utah or to place the child for adoption in Utah, he indisputably "had knowledge of facts that would lead a reasonable person to conclude" that Ms. Terry intended to give birth in Utah or place the child for adoption in Utah. Mr. Manzanares knew that Ms. Terry intended to place the child for adoption. He knew that the child would not be available for adoption under Colorado law. He knew that Ms. Terry had family in Utah and that Ms. Terry had been raised in Utah. He knew that Ms. Terry was a member of the LDS Church, which is headquartered in Utah, and that she intended to place the child for adoption with a couple who belonged to the LDS Church.[12] Mr. Manzanares also knew that Ms. Terry had planned no less than three trips to Utah in the latter half of her pregnancy.[13] And he knew that she did not want to talk to him about her adoption plans until after she returned from her trip to Utah. Mr. Manzanares knew that Ms. Terry had been meeting with LDS Family Services to discuss adoption plans. And he knew that Ms. Terry still intended to place the child for adoption even though she could not legally place the child for adoption in Colorado. These objective facts would lead any reasonable person to only one conclusion—that Ms. Terry intended to give birth in Utah or consent to an adoption in Utah. They thus demonstrate that Mr. Manzanares "ha[d] knowledge of facts that would lead a reasonable person ... to conclude that there was a" qualifying circumstance. And these facts, viewed in the light most favorable to the district court's ruling, certainly provide sufficient evidence to support its findings.

¶ 158 The majority spends significant time theorizing as to why Mr. Manzanares did not have *actual knowledge* of Ms. Terry's future intentions, but it spends no time analyzing whether Mr. Manzanares *should have known* of a qualifying circumstance. It spends no time assessing whether Mr. Manzanares had "knowledge of facts that would lead a reasonable person to conclude" that Ms. Terry intended to give birth or consent to an adoption in Utah. Instead, it claims only that "[t]ypically, this inquiry involves an exercise in the hypothetical—of what 'reasonable diligence' the father could have undertaken and of what he 'could have known' if he had been more diligent." *Supra* ¶ 71. Yet the majority provides no supporting authority for this new standard,[14] and it ignores the obvious conclusion that the facts indisputably known by Mr. Manzanares should have led him to infer, on good grounds, that Ms. Terry was planning on a Utah adoption.

¶ 159 What Mr. Manzanares actually inferred from known facts is demonstrated in his Colorado court pleadings where he testified that Ms. Terry planned on giving birth in Utah or consenting to an adoption here. But even if the statements in his petition are not reflective of what he actually knew, the facts would, at the very least, lead a reasonable person to conclude that Ms. Terry would "flee to Utah" to give birth to the baby or place the child for adoption. Therefore, at the very least, Mr. Manzanares "should have known" of a qualifying circumstance. This triggered his obligation to strictly comply with the Adoption Act's requirements by registering and filing a paternity petition in

12. According to Mr. Manzanares's petition, Ms. Terry "was advised by [LDS] Church officials that she should make the child available for adoption to a married [LDS] couple." Ms. Terry told Mr. Manzanares that she intended to place the child for adoption "to a young [LDS] couple who cannot have a baby." After informing him of her intent, LDS Family Services requested that he sign documents to make the child available for adoption. Mr. Manzanares asserted that Ms. Terry "repeatedly contacted [him] to attempt to persuade him to allow the child to be placed for adoption with [an LDS] family" and that she even contacted Manzanares' family members "to convince them to persuade [Mr. Manzanares] to allow the child to be placed for adoption with [an LDS] family."

13. In e-mails exchanged between Mr. Manzanares and Ms. Terry, Ms. Terry told him that she intended to travel to Utah in November, December, and February.

14. The majority cites to *O'Dea* to support its "exercise in the hypothetical." *Supra* ¶ 71. But *O'Dea* directly refutes the majority's position. In *O'Dea,* this court clearly stated that any reasonable diligence on behalf of the father is "irrelevant" once he knew or should have known of a qualifying circumstance. *O'Dea,* 2009 UT 46, ¶ 39, 217 P.3d 704.

Utah. UTAH CODE §§ 78B–6–121(3), – 122(1)(c)(ii)(A). Because he failed to do so, he "waived and surrendered" his parental rights. *Id.* § 78B–6–122(2).

### C. *Mr. Manzanares's Knowledge of a Qualifying Circumstance Continued Until "Immediately Before" Ms. Terry Consented to the Adoption of Baby B.*

¶ 160 The majority spends considerable time focusing on the actions of both Mr. Manzanares and Ms. Terry after the time that he filed the Colorado lawsuit. The majority acknowledges that Mr. Manzanares filed the Colorado lawsuit because he inferred that Ms. Terry planned to either give birth in Utah or place their child for adoption in Utah. But the majority holds that Mr. Manzanares's obligation of strict compliance did not ripen unless he had knowledge of a qualifying circumstance "immediately before" Ms. Terry executed her consent. Even under this framework, the evidence demonstrates that Mr. Manzanares knew, or should have known, that Ms. Terry planned on a Utah adoption.

¶ 161 The pleadings in the Colorado action demonstrate Mr. Manzanares's state of mind on the day before Ms. Terry executed her consent. The consent was executed on February 20. On February 19, Mr. Manzanares filed a pleading reaffirming his knowledge that Ms. Terry intended to place the child for adoption even though the child was then unavailable for adoption in Colorado. That pleading reiterated his knowledge that Ms. Terry was working with LDS Family Services and that an adoption case was underway. And Mr. Manzanares once again noted that he was "great[ly] alarm[ed]" because Ms. Terry had not "directly" denied that she was "planning on surreptitiously making the unborn child available for adoption and/or fleeing to Utah." Mr. Manzanares's knowledge is further demonstrated by the fact that after he discovered Ms. Terry was no longer

pregnant, he called her family in Utah (in addition to Colorado hospitals) in an attempt to locate the child.[15] Thus, even under the majority's standard, Mr. Manzanares knew or should have known of Ms. Terry's intentions and he maintained that knowledge at the time "immediately before" Ms. Terry executed her consent.

### D. *Ms. Terry's Vague Denials Did Not Negate Mr. Manzanares's Knowledge*

¶ 162 The majority insists that Ms. Terry's vague denials in her Colorado pleadings "mollified" any concerns Mr. Manzanares may have had regarding Ms. Terry's intentions to give birth or place the child for adoption in Utah. *Supra* ¶ 27. But even if this were true, it is irrelevant under the statute because the statute provides that a father must strictly comply if he becomes aware of a qualifying circumstance, which can occur "at any point" in time beginning at conception and ending when the mother executes a consent or relinquishment. The majority further claims that even if Mr. Manzanares would have conducted further inquiry, his efforts would have been futile because "the mother consistently ... denied, under oath and otherwise, any intention to give birth or consent to adoption in Utah." *Supra* ¶ 71. According to the majority, Ms. Terry's vague denials negated any knowledge on the part of Mr. Manzanares.

¶ 163 The majority overstates Ms. Terry's "consistent denials." In fact, Ms. Terry never directly denied that she intended to give birth or consent to an adoption in Utah. The majority cites to an e-mail exchange to prove Ms. Terry's "deni[al] ... [of] any intention to give birth or consent to adoption in Utah." *Supra* ¶ 71. But this e-mail only states that she intended to go to Utah in February and return to Colorado for work until she took time off to have the baby.[16] Ms. Terry did

---

15. In fact, the day that Mr. Manzanares discovered Ms. Terry was no longer pregnant, he called Ms. Terry's family members who had adopted Baby B. to ask them if they knew where the child was. They indicated that they were represented by legal counsel and would not answer his questions.

16. Ms. Terry's e-mail to Mr. Manzanares states: If you truly were concerned about the well being of this child you would do the right thing and consent to an adoption.... I will be flying to Utah to visit my father in Feb[ruary] for a week (maybe a little longer, it depends on how he/things are). Then it will be back to work to

not state that she intended to return to Colorado to have the baby. Indeed, the e-mail was likely indicative of her true intent, given that she did not expect that she would go into labor in February, weeks prior to her due date. But the fact that she did not intend to give birth in Utah in February does not imply that she did not plan on giving birth in Utah at a later date or that she did not plan on placing the child for adoption in Utah. In fact, she testified that while she was in Utah she researched hospitals and midwives, proving that was exactly her intent. Her e-mail to Mr. Manzanares did not deny that intention, and it did not indicate that she intended to give birth in Colorado.

¶ 164 In fact, nothing in any of Ms. Terry's communications with Mr. Manzanares could have provided an objective basis for mollifying his concerns that she intended to consent to an adoption in Utah. Both Ms. Terry's e-mail and court pleadings reaffirmed her intent to place the child for adoption, even after the child became unavailable for adoption in Colorado. When Mr. Manzanares stated in his Colorado paternity petition that "[Ms. Terry] intends to flee to Utah, where she has family, to proceed with an adoption," Ms. Terry did not directly deny this statement. Instead, she provided the vague response: "Deny, draws for legal conclusion." This is hardly the unequivocal denial that the majority makes it out to be. And it is uncontroverted that Mr. Manzanares recognized the vagueness of this statement when he stated in his February 19th pleading that "[Ms. Terry] does not directly deny his assertions ..., which cause[d][him] to have great alarm, as the paragraphs assert that Mother is planning on surreptitiously making the unborn child available for adoption and/or fleeing to Utah." In short, it is clear that Mr. Manzanares did not believe Ms. Terry's vague denials, and no objectively reasonable person knowing all the facts would have construed her vague denial as an assurance that she did not intend to go to Utah to give birth or consent to an adoption.

¶ 165 In summary, it is clear from Mr. Manzanares's court pleadings that he inferred on good grounds from known facts that Ms. Terry intended to give birth in Utah or consent to an adoption here. And even if his statements are not reflective of what he actually knew, the known facts would lead any reasonable person to conclude that Ms. Terry planned on fleeing to Utah to have the baby or place the child for adoption. Mr. Manzanares maintained that knowledge until Ms. Terry executed her consent to the adoption, and none of Ms. Terry's vague denials negated his knowledge. The district court correctly concluded that Mr. Manzanares knew or should have known of a qualifying circumstance and was therefore required to strictly comply with the Adoption Act's requirements for protecting his paternal rights. Because he failed to do so, he "waived and surrendered" his rights in Baby B.

### E. The District Court Properly Ignored Any Reasonable Diligence on the Part of Mr. Manzanares

¶ 166 The majority would also excuse a father from strict compliance where he takes any reasonably diligent steps in an effort to discover the mother's intent. The majority concludes that Mr. Manzanares is excused from strict compliance because he filed a paternity petition in a Colorado court. According to the majority, this was sufficiently reasonable diligence to excuse his lack of strict compliance with the Act. The majority's approach would excuse a father's failure to strictly comply with the Utah Adoption Act any time a father takes the "reasonably diligent step" of filing a paternity action in another state in an attempt to discover the mother's true intentions. But the Utah Adoption Act does not excuse a biological father from his obligation of strict compliance because of his "reasonable diligence." Indeed, the Act explicitly states that the filing of a paternity action in another state is only relevant in cases where the biological father lacks knowledge of a qualifying circumstance. UTAH CODE § 78B–6–122(1)(c)(i)(B).

finish up ... before I take time off at the end of March.... [T]his conversation causes me A LOT of stress and to avoid preterm labor (or other complications) in April I will be willing to sit down and talk with you about your reconsideration to consent for adoption otherwise this will be a long process and it will benefit no one, especially this baby.

## CONCLUSION

¶ 167 The majority's holding creates a framework that wholly undermines the Legislature's intent in passing the Utah Adoption Act. Instead of respecting the factual findings of the district court and applying the Act as written, the majority ignores the Legislature's inquiry notice standard and replaces it with a subjective standard that excuses a biological father from compliance with the Act unless he had actual knowledge as to the birth mother's future intent to place her child for adoption in Utah. The majority's approach will allow fathers to disrupt both adoptive placements and finalized adoptions by excusing a father's strict compliance with the Act anytime he takes the "reasonably diligent" step of filing a paternity petition in another state. The majority's holding is entirely at odds with both the language and the clearly enunciated legislative intent of the Utah Adoption Act.

¶ 168 Until today, this court has applied Utah's adoption laws as the Legislature has written them. While applying the law as written would lead to an unpalatable result in this case by rewarding outrageous and fraudulent conduct on the part of the birth mother, it is nevertheless our obligation to apply the Act that the Legislature has adopted. For these reasons, I am compelled to dissent.